ORIGINAL

RECEIVED
FEB - 5 2010
xPRO SE OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------

ROBERT J. FILECCIA,

        Plaintiff,

  -against-

THE CITY OF NEW YORK;
DISTRICT ATTORNEY DANIEL DONOVAN;
FORMER DISTRICT ATTORNEY WILLIAM MURPHY;
DAVID FREY;
ELIZABETH WATTS;
STEVEN ORLANDO;
LORI ELLEN ORLANDO A/K/A LORIELLEN KEISER;
DATA COMM CONSULTING GROUP INC.;
1276 CASTLETON REALTY CO., L.L.C.;
KAREN VARRIALE;
MICHAEL BOUSQUET;
MARIO MATTEI;
JOHN/JANE DOE ASSISTANT DISTRICT ATTORNEYS;
POLICE COMMISSIONER RAYMOND KELLY;
DETECTIVE GEORGETTE ROMAGNANO;
JOHN DOE POLICE OFFICERS;
DETECTIVE ROBERT NESTEL;
FORMER NYC DEPARTMENT OF FINANCE
COMMISSIONER MARTHA STARK;
NYC DEPARTMENT OF FINANCE COMMISSIONER
DAVID M. FRANKEL;
MAUREEN KOKEAS;
MICHAEL SCHENK;
RAYMOND TASSIELLO;
ALFRED ARENA;
HARRY MOSES;
CHARLES CUTAIA;
ROBERT STAHL;
DAVID ATIK;
NYC COMPTROLLER WILLIAM THOMPSON;
MICHAEL AARONSON;
ROBERT HOWE;
KEVIN BRYANT;
BEN SAMUEL;
BENJAMIN BRAFMAN;
BRAFMAN & ROSS, P.C.;

**COMPLAINT**

**JURY TRIAL**
**DEMANDED**

10  0530

ROSS, J.

LEVY, M.J

1

BRAFMAN AND ASSOCIATES, P.C.;                          :
MARK M. BAKER;                                         :
ALEX SHULMAN A/K/A ALEX HEDY SHULMAN;                  :
VICTORY STATE BANK;                                    :
VSB BANCORP, INC.                                      :
KEITH D. CHRISTENSEN;                                  :
COMMISSIONER STEPHEN J. FIALA, RICHMOND                :
COUNTY CLERK STATEN ISLAND, NY;                        :
MARIO DIRE,                                            :
                                                       :
                        Defendants.                    :
-------------------------------------------------------------------------X

Pro se indigent Plaintiff ROBERT J. FILECCIA, being an attorney at law, duly admitted to

practice in the courts of New York, complaining of the Defendants respectfully affirms the

following allegations to be true under the penalty of perjury:

1.      This affirmation is based upon personal knowledge, sworn testimony, upon information

        and belief, and other evidence the sources of which include:

        a)   Independent investigations performed by licensed private investigators including

             former FBI Agents, United States Postal Inspectors,  and chief of detectives assigned

             to the FBI's Violent Crime Task Force in Albany, Brooklyn, Bronx, Manhattan, Long

             Island, Queens, Staten Island, Pennsylvania, Reno Nevada, among other places;

        b)   All pre-trial and trial proceedings in Richmond County Indictment No. 23/2004,

             hereinafter denominated "The Tax Indictment," that was severed into two trials,

             People v. Richard Fileccia, et al. and People v. Robert Fileccia, the latter proceeding

             having gone to trial and terminated on February 7, 2007 in favor of the accused. The

             severed one-count tax trial (Count 14 of Indictment 23/2004) is the basis of the

             instant Complaint.  I respectfully incorporate by reference all pre-trial and trial

             proceedings for Indictment 23/2004 into this Complaint including but not limited to

2

the grand jury minutes, grand jury exhibits, pre-trial and trial transcripts, prosecutor's witness list and trial exhibits;

c) All pre-trial and trial proceedings in Richmond County Indictment No. 62/2002, People v. Robert Fileccia, et al. hereinafter denominated "The Car Indictment," including but not limited to the grand jury minutes and exhibits that did not go to trial and terminated on February 27, 2007 in favor of the accused, which I respectfully incorporate by reference into this Complaint. The Car Indictment is not the basis of the instant Complaint. A separate civil rights law suit will be filed in this Court before February 27, 2010;

d) All proceedings relative to a CPLR Article 13A civil forfeiture case William Murphy v. Robert Fileccia, et al., Index No. 8103/2002, hereinafter denominated "Civil Forfeiture Case No. 1" that terminated on August 20, 2007 in favor of the accused when prosecutors voluntarily abandoned their fraudulent accusations with prejudice, which I respectfully incorporate by reference into this Complaint. Civil Forfeiture Case No. 1 is not the basis of the instant Complaint. A separate civil rights law suit will be filed in this Court on or before August 20, 2010.

e) All proceedings relative to a CPLR Article 13A civil forfeiture case Daniel Donovan v. Robert Fileccia, Index No. 12140/2004, hereinafter denominated "Civil Forfeiture Case No. 2", that terminated on August 20, 2007 in favor of the accused when prosecutors voluntarily abandoned their fraudulent accusations with prejudice, which I respectfully incorporate by reference into this Complaint. Civil Forfeiture Case No. 2 is not the basis of the instant complaint. A separate civil rights law suit will be filed in this Court on or before August 20, 2010.

3

f) All proceedings relative to a CPLR Article 13A civil forfeiture case <u>Daniel Donovan v. Richard Fileccia</u>, Index No. 12141/2004, hereinafter denominated "Civil Forfeiture Case No. 3", that terminated on August 20, 2007 in favor of the accused when prosecutors voluntarily abandoned their fraudulent accusations with prejudice, which I respectfully incorporate by reference into this Complaint. Civil Forfeiture Case No. 3 is not the basis of the instant complaint. A separate civil rights law suit will be filed by the Plaintiff's brother Richard Fileccia in this Court on or before August 20, 2010.

g) More than seventeen thousand (17,000) Bates-stamped exculpatory documents seized by the NYC Police Department on March 19, 2002 during a break in—warrantless search and seizure—at 496 Willowbrook Road in Staten Island, New York, hereinafter denominated "The Stolen Fileccia Records"; and

h) Recorded telephone conversations between Plaintiff and NYC Department of Finance Chief Auditor Michael Schenk on January 19, 2007 and January 24, 2007.

## 2. JURISDICTION AND VENUE

2. This action arises under the Constitution of the United States, particularly the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment to the Constitution of the United States through the Civil Rights Act, Title 42 U.S.C. § 1983 as well as Article I, §§6 and 11 of the New York State Constitution, for the violation of Plaintiff Robert J. Fileccia's civil and constitutional rights.

3. This Court has jurisdiction over this action under 28 USC §§ 1331 and 1343.

4. This Court also has supplemental, ancillary and pendant jurisdiction to adjudicate all claims asserted under state law herein under 28 USC §§ 1367.

5. The acts and transactions constituting the civil rights and constitutional violations

occurred in the County of Richmond (Staten Island) and County of Kings, in the Eastern District of New York. In addition, the Defendants reside, are found, have agents, or transact their affairs in the Eastern District of New York. Venue is therefore proper in this district pursuant to 28 USC §§ 1391 (b).

## 2. INTRODUCTION TO THE CLAIM

6. In October of 2001, "Operation Shame on You" was a black operation that was dubbed and implemented by the Richmond County District Attorney's Office against two innocent United States Citizens, Robert and Richard Fileccia.

7. The operation masqueraded as a **309-Count** Enterprise Corruption Indictment whose objective was to steal money to finance the District Attorney's continuing criminal enterprise.

8. The record evidence indicates it was sanctioned and backed by State Supreme Court Judges.

9. Assistant District Attorney David Frey was the desk officer having fabricated the indictment, People v. Robert Fileccia and Richard Fileccia, No. 62/2002 that was unsealed on March 19, 2002.

10. The specific allegations: first, that Richard Fileccia, auto mechanic, charged customers for repairs not made; second, that Robert Fileccia, real estate lawyer, then sued these customers for payment in small claims court.

11. Almost immediately, the operation went sideways and had to be shut down and tied off. ADA Frey bungled his illegal entry operation by executing a warrantless break-in at 496 Willowbrook Road in Staten Island and leaving behind the victims' photograph negatives that were detailed before-and-after photographs of the auto repairs complained of. Not

5

only did the photographs prove that all the repairs were in fact made—but <u>when</u> they were made—because of the newspaper Richard Fileccia used to catch oil and lay parts on.

12. Armed with the photographs, Robert Fileccia's licensed private investigators picked apart the District Attorney's case exposing widespread crime, including ADA David Frey's Mail Theft Ring.

13. In August of 2002, Robert Fileccia became an agency priority target.  ADA Frey knew his manufactured indictment was in a death spiral and contacted the NYC Department of Finance to develop a plan **'to get Robert Fileccia'** and set him up for tax evasion.  DA Donovan approved and ratified the plan even though almost everything in it was illegal.

14. ADA Frey's **17-Count** tax evasion indictment was dismissed on February 7, 2007 in favor of Robert and Richard Fileccia.

15. ADA Frey's **309-Count** Enterprise Corruption Indictment was dismissed on February 27, 2007 in favor of Robert and Richard Fileccia.

16. On August 20, 2007, District Attorney Donovan voluntarily withdrew with prejudice his three civil forfeiture proceedings against Robert and Richard Fileccia that originally requested forfeiture of **$1,702,491.50**.

17. The dismissal of Plaintiff Robert Fileccia's tax evasion indictment is the basis of the instant Complaint.

### 3. THE INDIGENT PRO SE PLAINTIFF

18. Plaintiff, Robert J. Fileccia, is and always has been an innocent United States Citizen.  I have never been arrested or accused of a crime before the acts and transactions constituting the civil rights violations described herein.

19.     Plaintiff was at the time of my unlawful seizure a resident of Richmond County at 126 Egbert Avenue, Staten Island, New York 10310. Plaintiff presently resides at 496 Willowbrook Road, Staten Island, New York 10314.

20.     On March 18, 2002, the Plaintiff was wrongfully indicted for Enterprise Corruption— The Car Indictment—based upon fraud, perjury, the suppression of exculpatory evidence, and other conduct undertaken in bad faith. The Plaintiff and his brother Richard Fileccia were falsely accused of three hundred nine (**309**) crimes without reasonable or probable cause or arguable probable cause.

21.     Investigations revealed that in or around December 2001, Assistant District Attorney David Frey (hereinafter referred to as "ADA Frey"), his paralegal Elizabeth Watts, and operatives within the United States Postal Service and Postal Inspection Service implemented a clandestine Mail Theft operation designed to manufacture fraudulent evidence against innocent United States citizens to falsely accuse them of crimes in order to steal their money and property. ADA Frey's mail theft ring was also surreptitiously used to cover up his criminal activity to avoid detection and apprehension. Indisputable documentary evidence including eye witness and ear witness testimony is set forth in detail and with specificity below.

22.     On March 20, 2002, District Attorney William Murphy filed a fraudulent and conspicuously unpublicized Article 13A civil forfeiture law suit against the Plaintiff, his brother Richard Fileccia, and 85 year old mother Virginia Fileccia in <u>William Murphy v. Richard Fileccia, Robert Fileccia, et al.</u>, Index No. 8103/02. DA Murphy's collateral objective was extortion, intending to forcibly steal the Fileccia Family's entire lifetime savings—one million one hundred forty thousand three hundred thirty nine dollars

(**$1,140,339.60**) of cash and real estate.  On March 20, 2002, temporary restraining orders were issued without probable or reasonable cause that restrained all of the Plaintiff's and my family's money.  The 'rubberstamped' TROs marked the beginning of years of poverty and shame for the Plaintiff when I was unable to feed or care for my then 6-month old daughter Sofia Christina.

23.    In retribution for uncovering prosecutors' criminal activity in The Car Indictment, on January 30, 2004, District Attorney Daniel Donovan wrongfully and maliciously indicted the Plaintiff for tax evasion—The Tax Indictment—based upon fraud, perjury, the suppression of exculpatory evidence, and other conduct undertaken in bad faith.  The Plaintiff and brother Richard Fileccia were charged with four (4) additional tax related crimes without reasonable or probable cause or arguable probable cause.  The basis of The Tax Indictment included fraudulent evidence manufactured by David Frey's ongoing mail theft operation explained further below.

24.    To inflict grave sorrow and distress on the Plaintiff and his family, on July 26, 2004, District Attorney Daniel Donovan filed two more frivolous Article 13A civil forfeiture law suits against the Plaintiff and his brother, <u>Donovan v. Robert Fileccia</u>, Index No. 12140/2004 and <u>Donovan v. Richard Fileccia</u>, Index No. 12141/2004 unlawfully seeking additional forfeiture in the amount of $46,129 and $102,474.28 respectively.

25.    On February 7 and February 27, 2007, all criminal charges pending against Plaintiff and his brother Richard Fileccia were dismissed in New York State Supreme Court in favor of the accused.  The dismissal of all three hundred thirteen (**313**) criminal charges was <u>not</u> inconsistent with the Plaintiff's innocence.

26.    On August 20, 2007, District Attorney Daniel Donovan voluntarily abandoned Civil

Forfeiture Case Nos. 1, 2, and 3 with prejudice that originally requested One Million, Seven Hundred Two Thousand, and Four Hundred Ninety One dollars and fifty cents ($1,702,491.50).   Plaintiff and his brother did not compromise with prosecutors who never received a cent of the unlawfully restrained assets.

27.   District Attorneys William Murphy and Daniel Donovan, the above captioned Defendants, and at least four Staten Island Supreme Court Judges (hereinafter referred to as "The Plumbers Team") knowingly and intentionally delayed the resolution of the three criminal cases and three civil forfeiture cases for more than five years—until the New York statute of limitations for felonies expired—to avoid detection, apprehension and punishment for their ongoing criminal activity.

28.   The Defendants ruthlessly and purposely devised the foregoing seizures and continued seizures to cause anguish—acute deeply felt inner pain—and despair to the Plaintiff, my now 8-year old daughter Sofia Christina, estranged wife and family.

29.   Plaintiff is an attorney at law

    a) admitted to practice in all Courts of the State of New York on May 20, 1992;

    b) admitted to practice in the United States District Court for the Eastern District of New York on March 31, 1995;

    c) admitted to practice in the United States District Court for the Southern District of New York on October 14, 2009;

    d) admitted to practice in the United States Court of Appeals for the Second Circuit on November 23, 2009;

    e) and who was Certified by the New York Court of Appeals for prospective admission into the United States Supreme Court on October 27, 2009.

30.   The Plaintiff has never been suspended or disbarred from the practice of law and remains an attorney in good standing in all state and federal courts, notwithstanding prosecutors' malicious extrajudicial statements and rumors to the contrary.

31.   Notwithstanding the Plaintiff's admission to the Eastern District and registration on the Electronic Case Filing (ECF) System on October 15, 2009 in preparation for the instant litigation, the Plaintiff is not a civil rights expert, has never before filed any civil action in any Federal Court, and is therefore no different than an ordinary pro se litigant eminently deserving of the special solicitude normally afforded pro se litigants by the Federal Courts: the well established rules that the complaint of a pro se litigant should be liberally construed in his favor, that his allegations must be taken as true in considering whether a claim is stated, and that his complaint not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

32.   On November 25, 2005, Richmond County Supreme Court Judge Leonard Rienzi certified the Plaintiff to be a poor person [Tr. 11/29/05 at 5, Indictment 62/2002] after the Plaintiff was forced by prosecutors to file for divorce in order to obtain the promised services of an 18b legal aid lawyer, who was later bribed, threatened, or influenced by prosecutors to assist them in maintaining the malicious prosecution.

33.   On October 29, 2009, Albany County Supreme Court Judge Roger D. McDonough certified the Plaintiff's brother Richard Fileccia to be indigent and thereby entitled to poor person relief in a related Article 78 action. Richard Fileccia's claims of poverty, which are virtually identical to that of the Plaintiff, went unopposed by the New York Attorney General.

34.    As a result of the Defendants' malevolence, the Plaintiff was unemployed and without any sources of income for more than six years—March 19, 2002 to September 19, 2008—causing indescribable financial and personal ruin. Mortgages and the Plaintiff's credit cards defaulted. Computer systems and office equipment failed, and sections of my mother's home where I have been living became uninhabitable because of my financial inability to repair or maintain them. I have no savings, no real or personal property, except a 9 year old Toyota automobile that I invite the defendants to appraise. I have not had medical insurance since my unlawful seizure on March 19, 2002. I live separate and apart from my eight year old daughter Sofia Christina and her mother for the majority of the last 8 years. My marriage is irreparable. I remain in debt for hundreds of thousands of dollars to family and friends who continue to help support me. Although I have recently earned some income from September 19, 2008 to December 24, 2009, the overwhelming majority of it was used to repay a small fraction of my debt to family and friends. Therefore, by any objective standard, I remain a poor person and destitute until date, as a result of the Defendants cruel and unusual, yet intentional punishment.

## 4. THE DEFENDANTS

35.    At all times referred to herein, Defendant The City of New York ("The City") was and still is a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York.

36.    At all relevant times to herein, the Police Department of the City of New York (hereinafter "NYPD"), NYC Department of Finance (hereinafter "DOF"), Office of the New York City Comptroller (hereinafter "Comptroller's Office"), and Richmond County Clerk's Office (hereinafter "RCCO") was and still are agencies or instrumentalities of

The City. The NYPD, DOF, Comptroller's Office, and RCCO did not and does not have a legal identity separate and apart from Defendant The City.

37.    At all times referred to herein, Defendant The City, by its agents, servants and representatives, was responsible for the operation, maintenance and control of the NYPD, DOF, Comptroller's Office, RCCO, and the Richmond County District Attorney's Office and the selection, training, supervision, evaluation and disciplining of NYPD, DOF, Comptroller's Office, RCCO personnel and Assistant District Attorneys in the Richmond County District Attorney's Office.

38.    At all times referred to herein, Defendants Daniel Donovan and William Murphy were the elected District Attorneys of Richmond County for the City (hereinafter referred to, respectively, as "DA Murphy" and "DA Donovan"), and Defendants David Frey, Esq. (hereinafter "ADA Frey"), Karen Varriale, Esq. (hereinafter "ADA Varriale"), Michael Bousquet, Esq. (hereinafter "ADA Bousquet"), Mario Mattei, Esq. (hereinafter "ADA Mattei"), and various John Doe Assistant District Attorneys (hereinafter "ADA John Does"), were Assistant District Attorneys in the Office of the District Attorney, County of Richmond. Defendant Elizabeth Watts (hereinafter "Paralegal Watts"), was and still is a paralegal employed by the Richmond County District Attorney's Office.

39.    At all times referred to herein, Defendants DA Murphy and DA Donovan, as District Attorneys for Richmond County, were the responsible policy makers for Defendant The City and the State of New York with respect to the management of the Richmond County District Attorney's Office.

40.    At all relevant times, Defendants DA Donovan, DA Murphy, ADA Frey, ADA Varriale, ADA Bousquet, ADA Mattei, Paralegal Watts, and various ADA John/Jane Does, were

acting within the scope of their employment as District Attorneys, Assistant District Attorneys, and paralegal for the State of New York.

41.    At all relevant times, Defendants DA Donovan, DA Murphy, ADA Frey, ADA Varriale, ADA Bousquet, ADA Mattei, Paralegal Watts, and various ADA John/Jane Does, were acting under the color and pretense of the laws, statutes, ordinances, regulations, customs, and usages of the City and State of New York and under the authority of the Richmond County District Attorney's Office.

42.    At all times herein, Defendants DA Donovan, DA Murphy, ADA Frey, ADA Varriale, ADA Bousquet, ADA Mattei, and various ADA John/Jane Does, acted on behalf of Defendant The City and the State of New York as municipal policymakers with the granted authority to (a) determine what exculpatory information, records and evidence should be gathered and disclosed to a suspect or his lawyer during an investigation (investigatory phase) and/or prosecution (judicial phase); (b) determine what evidence and testimony should be gathered and presented at grand jury proceedings, hearings and trial; (c) ensure that criminal investigations are conducted thoroughly and diligently and that reasonable inquiry is made before a suspect is accused of a crime; (d) ensure that evidence is not fabricated, hidden, misplaced, ignored or destroyed in order to seize and falsely accuse an innocent United States citizen; (e) ensure that evidence is not falsified, fabricated, or withheld; (f) ensure that exculpatory evidence not be destroyed or otherwise made unavailable to a suspect or the accused; (g) ensure that witnesses do not commit perjury, give inaccurate or misleading testimony, or intentionally omit the truth when testifying; (h) ensure that extrajudicial statements not be made to the press before or during criminal proceedings that will foreseeably prejudice the accused; (i) ensure that

criminal investigations and proceedings are handled ethically and in accordance with the laws and Constitution of the State of New York and the United States; (j) assert meritorious arguments that have a firm basis in fact and law; (k) conduct thorough and diligent investigations to protect the rights of the innocent; (l) ensure that evidence is properly registered, stored, preserved, maintained and produced in a timely manner to a criminal suspect, defendant and his/her attorneys; (m) refrain from committing federal or state criminal offenses or otherwise engaging in criminal activity to frame (set up) an innocent United States citizen in order to procure his wrongful seizure and or malicious continuing seizure; (n) refrain from aiding or abetting criminal activity or assisting a perpetrator from avoiding detection and or apprehension; (o) refrain from applying for search warrants without probable cause; (p) refrain from conducting warrantless searches and seizures; (q) refrain from endorsing and or ratifying an unconstitutional policy by receiving an unauthorized money bonus, career advancement, bribe, or other things of value in return for convicting or attempting to convict an innocent (or guilty) United States citizen; (r) refrain from bribing witnesses by offering them something of value in exchange for their perjured testimony; (s) ensure that a chain of custody is established and maintained for all evidence during the pendency of the proceeding and for a reasonable time thereafter.

43.    At all times referred to herein, Defendant Commissioner Raymond Kelly (hereinafter "Ray Kelly") was employed by the Defendant The City as a supervisor, policy maker and Commissioner for the NYPD.

44.    At all times referred to herein, Defendant Ray Kelly, as Commissioner of the NYPD, is the responsible policy maker for Defendant The City and the State of New York with

respect to the management of the NYPD.

45.  At all times referred to herein, Defendant Detective Georgette Romagnano (Shield 2630) (hereinafter "Romagnano") was employed by the Defendant The City as a police officer assigned to the Staten Island Auto Squad.

46.  At all times referred to herein, Defendant John Doe Police Officers (hereinafter "John Doe Police Officers") were employed by the Defendant The City as police officers assigned to the Staten Island Auto Squad and or Richmond County District Attorney's Squad.

47.  At all times referred to herein, Defendant Detective Robert Nestel (Shield 1192) (hereinafter "Nestel") was employed by the Defendant The City as a police officer assigned to the Richmond County District Attorney's Squad.

48.  At all times referred to herein, Defendants Ray Kelly, Romagnano, Nestel, and various John Doe Police Officers, individually and in their official capacities as employees of the City of New York, who are/were members of the NYPD, were employed by the Defendant The City as police officers and were involved in acts and/or omissions relating to the wrongful seizure and malicious continuing seizure of Plaintiff Robert J. Fileccia, subsequent cover up of the fabricated indictment, Assistant District Attorney David Frey's mail theft ring, and/or registration and/or maintenance and/or storage and/or control of evidence relating to Richmond County Indictment Nos. 62/2002 and 23/2004.

49.  At all times referred to herein, Defendants Ray Kelly, Romagnano, Nestel, and various John Doe Police Officers, individually and in their official capacities as employees of the City of New York, who are/were members of the Police Department of the City of New York, acted within the scope of their employment as police officers for Defendant The

City.

50.    At all times referred to herein, Defendants Ray Kelly, Romagnano, Nestel, and various John Doe Police Officers, individually and in their official capacities as employees of the City of New York, who are/were members of the NYPD, were acting under the color and pretense of the law, statutes, ordinances, regulations, customs, and usages of the City of New York and under the authority of Defendant The City.

51.    At all times referred to herein, Defendants Ray Kelly, Romagnano, Nestel, and various John Doe Police Officers, individually and in their official capacities as employees of The City who are/were members of the NYPD, were responsible for the unbiased investigation of crimes, the apprehension of proper suspects, the pursuit and study of physical evidence, and the providing of accurate and truthful information for prosecution to the Richmond County District Attorney's Office and other prosecutorial authorities; these Defendants were also responsible for other functions including giving truthful evidence; revealing exculpatory evidence; refraining from withholding or falsifying evidence during the plotting (investigatory) stage of a criminal proceedings, from a grand jury or at trial; refraining from fabricating evidence; refraining from initiating or instigating an arrest or prosecution without probable or reasonable cause or arguable probable cause; refraining from applying for search warrants without probable cause; refraining from conducting warrantless searches and seizures; making further inquiry when reasonable in a criminal investigation (and not deviating from accepted practices in that regard); and preserving and properly storing critical evidence resulting from a criminal investigation; these Defendants were obliged to perform all these functions in accordance with the Constitutions and laws of the State of New York and the United

States to ensure that innocent people are not arrested, prosecuted, convicted and incarcerated unjustly.

52.     At all times referred to herein, Defendant Commissioner Martha Stark (hereinafter "Stark") was employed by the Defendant The City as a supervisor, policy maker and Commissioner for the DOF.

53.     At all times referred to herein, Defendant Commissioner David M. Frankel (hereinafter "Frankel") was and is employed by the Defendant The City as a supervisor, policy maker and Commissioner for the DOF.

54.     At all times referred to herein, Defendants Stark and Frankel, as Commissioners of the DOF, are the responsible policy makers for Defendant The City and the State of New York with respect to the management of the DOF.

55.     At all times referred to herein, Defendant Maureen Kokeas (hereinafter "Kokeas") was employed by the Defendant The City as a special assistant and Director of Enforcement for the DOF.

56.     At all times referred to herein, Defendant Michael Schenk (hereinafter "Schenk") was employed by the Defendant The City as an Audit Group Chief for the Enforcement Division of the DOF.

57.     At all times referred to herein, Defendant Raymond Tassiello (hereinafter "Tassiello") was employed by the Defendant The City as an auditor for the Enforcement Division of the DOF.

58.     At all times referred to herein, Defendant Alfred Arena (hereinafter "Arena") was employed by the Defendant The City as an auditor for the Enforcement Division of the DOF.

59.    At all times referred to herein, Defendant Harry Moses (hereinafter "Moses") was employed by the Defendant The City as an auditor for the Enforcement Division of the DOF.

60.    At all times referred to herein, Defendant Charles Cutaia (hereinafter "Cutaia") was employed by the Defendant The City as an auditor for the Enforcement Division of the DOF.

61.    At all times referred to herein, Defendant Robert Stahl (hereinafter "Stahl") was employed by the Defendant The City as an auditor/supervisor for the Enforcement Division of the DOF.

62.    At all times referred to herein, Defendant David Atik (hereinafter "Atik") was and is employed by the Defendant The City as a Freedom of Information Law (FOIL) lawyer and records access officer for the DOF.

63.    At all times referred to herein, Defendants Stark, Frankel, Kokeas, Schenk, Tassiello, Arena, Moses, Cutaia, Stahl and Atik, individually and in their official capacities as employees of the City of New York, who are/were members of the DOF, were employed by the Defendant The City and were involved in acts and/or omissions relating to the wrongful seizure and malicious continuing seizure of Plaintiff Robert J. Fileccia's under Richmond County Indictment No. 23/2004, subsequent cover up of the fabricated indictment, and Assistant District Attorney David Frey's mail theft ring.

64.    At all times referred to herein, Defendants Stark, Frankel, Kokeas, Schenk, Tassiello, Arena, Moses, Cutaia, Stahl and Atik, individually and in their official capacities as employees of the City of New York, who are/were members of the DOF, acted within the scope of their employment for Defendant The City.

65. At all times referred to herein, Defendants Stark, Frankel, Kokeas, Schenk, Tassiello, Arena, Moses, Cutaia, Stahl and Atik, individually and in their official capacities as employees of the City of New York, who are/were members of the DOF, were acting under the color and pretense of the law, statutes, ordinances, regulations, customs, and usages of the City of New York and under the authority of Defendant The City.

66. At all times referred to herein, Defendants Stark, Frankel, Kokeas, Schenk, Tassiello, Arena, Moses, Cutaia, Stahl and Atik, individually and in their official capacities as employees of the City of New York, who are/were members of the DOF, were responsible for the unbiased investigation of suspected tax crimes and offenses; the providing of accurate and truthful information to the Richmond County District Attorney's Office and other prosecutorial authorities; giving truthful testimony to a grand jury or at a hearing or trial; revealing exculpatory evidence to prosecutors, a grand jury, at a hearing or trial; refraining from withholding or falsifying evidence during the plotting (investigatory) stage of a criminal proceedings, from a grand jury or at trial; refraining from misleading or deceiving law enforcement, a grand jury or petit jury; refraining from fabricating false evidence; refraining from initiating or instigating an arrest or prosecution without probable or reasonable cause; making further inquiry when reasonable in a criminal investigation (and not deviating from accepted practices in that regard); and preserving and properly storing critical evidence resulting from a criminal investigation; these Defendants were obliged to perform all these functions in accordance with the Constitutions and laws of the State of New York and the United States to ensure that innocent people are not arrested, prosecuted, convicted and incarcerated unjustly.

67. At all times referred to herein, Defendant NYC Comptroller William Thompson

(hereinafter "Thompson") was employed by the Defendant The City as a supervisor, policy maker and Comptroller.

68.    At all times referred to herein, Defendants Thompson, as Comptroller for The City, is the responsible policy maker for Defendant The City and the State of New York with respect to the management of the Comptroller's Office.

69.    At all times referred to herein, Defendant Michael Aaronson (hereinafter "Aaronson") was employed by the Defendant The City as a bureau chief for the Comptroller's Office.

70.    At all times referred to herein, Defendant Robert Howe (hereinafter "Howe") was employed by the Defendant The City as a supervisor for the Comptroller's Office.

71.    At all times referred to herein, Defendant Kevin Bryant (hereinafter "Bryant") was employed by the Defendant The City as a claims manager for the Comptroller's Office.

72.    At all times referred to herein, Defendant Ben Samuel (hereinafter "Samuel") was employed by the Defendant The City as a claims manager for the Comptroller's Office.

73.    At all times referred to herein, Defendants Thompson, Aaronson, Howe, Bryant, and Samuel, individually and in their official capacities as employees of the City of New York, who are/were members of the Comptroller's Office, were employed by the Defendant The City and were involved in acts and/or omissions relating to the wrongful seizure and malicious continuing seizure of Plaintiff Robert J. Fileccia under Richmond County Indictment No. 23/2004, subsequent cover up of the fabricated indictment, and Assistant District Attorney David Frey's mail theft ring

74.    At all times referred to herein, Defendants Thompson, Aaronson, Howe, Bryant, and Samuel, individually and in their official capacities as employees of the City of New York, who are/were members of the Comptroller's Office, acted within the scope of their

employment for Defendant The City.

75.    At all times referred to herein, Defendants Thompson, Aaronson, Howe, Bryant, and Samuel, individually and in their official capacities as employees of the City of New York, who are/were members of the Comptroller's Office, were acting under the color and pretense of the law, statutes, ordinances, regulations, customs, and usages of the City of New York and under the authority of Defendant The City.

76.    At all times referred to herein, Defendants Thompson, individually and in his official capacity as employee of the City of New York, who is/was a member of the Comptroller's Office, was responsible for the unbiased investigation and audit of the financial and operating practices of the Richmond County District Attorney's Office, the unbiased investigation and reporting of one time "unjustified" payments of money—performance bonuses—to prosecutors based upon the number of convictions they obtain (notwithstanding the guilt or innocence of the accused), reporting non-salary payments of money to Assistant District Attorneys, reporting employee theft to law enforcement authorities, and reporting unregistered bank accounts or other slush funds to the authorities including the source and use of the slush funds.  This Defendant was also required to ensure that the Richmond County District Attorney's Office did not promulgate, ratify, and or enforce unconstitutional policies or customs by making one time "unjustified" payments—performance bonuses—to prosecutors based upon the number of convictions they obtain.  This Defendant was obliged to perform all these functions in accordance with the Constitutions and laws of the State of New York and the United States to ensure that innocent people are not arrested, prosecuted, convicted and incarcerated unjustly.

77.   At all times referred to herein, Defendants Thompson, Aaronson, Howe, Bryant, and Samuel, individually and in their official capacities as employees of the City of New York, who are/were members of the Comptroller's Office, were responsible for the timely and accurate assignment of claim numbers to all notices of claim that claimants timely served on the Controller's Office. These Defendants were also responsible for other functions including refraining from misleading claimants as to their constitutional right of access to the Courts. These Defendants were obliged to perform all these functions in accordance with the Constitutions and laws of the State of New York and the United States.

78.   At all times referred to herein, Defendant Steven Orlando (hereinafter "Steven Orlando") is a citizen of the United States, who resides at 10 Westbury Avenue, Staten Island, New York 10301, and was a willful participant in joint activity with the State or its agents.

79.   At all times referred to herein, Defendant Lori Ellen Orlando a/k/a Loriellen Keiser (hereinafter "Lori Orlando") is a citizen of the United States, who resides at 10 Westbury Avenue, Staten Island, New York 10301, and was a willful participant in joint activity with the State or its agents.

80.   At all times referred to herein, Defendant Data Comm Consulting Group Inc. (hereinafter "Data Comm") is a domestic corporation, duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business at 1276 Castleton Avenue, Staten Island, New York, 10310, and was a willful participant in joint activity with the State or its agents.   Lori Ellen Orlando is the Chairman or Chief Executive Officer of Data Comm Consulting Group Inc.

81.   At all times referred to herein, Defendant 1276 Castleton Realty Co., LLC (hereinafter

"1276 Castleton Realty Co.") is a domestic limited liability company, duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business at 1276 Castleton Avenue, Staten Island, New York 10310, and was a willful participant in joint activity with the State or its agents.   Steven Orlando is a managing member of 1276 Castleton Realty Co., LLC.

82.    At all times referred to herein, Defendant Benjamin Brafman, Esq. (hereinafter "Brafman") is a citizen of the United States, who resides at 15 Waverly Place, Lawrence, New York 11559-2512, and was a willful participant in joint activity with the State or its agents.

83.    At all times referred to herein, Defendant Brafman & Ross P.C. (hereinafter "Brafman & Ross") is a domestic professional corporation duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business at 767 Third Avenue, 26th Floor, New York, New York 10017, and was a willful participant in joint activity with the State or its agents.  Benjamin J. Brafman is the Chairman or Chief Executive Officer of Brafman & Ross P.C.

84.    At all times referred to herein, Defendant Brafman and Associates, P.C. (hereinafter Brafman and Associates") is a domestic professional corporation duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business at 767 Third Avenue, 26th Floor, New York, New York 10017, and was a willful participant in joint activity with the State or its agents.  Benjamin J. Brafman is the Chairman or Chief Executive Officer of Brafman and Associates, P.C.

85.    At all times referred to herein, Defendant Mark M. Baker, Esq. (hereinafter "Baker") is a citizen of the United States, who resides at 2621 Palisade Avenue, #6B, Bronx, New

York 10463-6120, and was a willful participant in joint activity with the State or its agents.

86.    At all times referred to herein, Defendant Alex Shulman, Esq. a/k/a Alex Hedy Shulman (hereinafter "Shulman") is a citizen of the United States, who resides at 7 Dewhurst Street, Staten Island, New York 10314-5005, and was a willful participant in joint activity with the State or its agents.

87.    At all times referred to herein, Defendant VSB BANCORP, Inc. (hereinafter "VSB") is a domestic business corporation duly organized and existing under and by virtue of the laws of the State of New York, with its main office and principal place of business at 4142 Hylan Boulevard, Staten Island, New York 10308, and was a willful participant in joint activity with the State or its agents.  The business entity "VSB" uses the company name "Victory State Bank."

88.    At all times referred to herein, Defendant Victory State Bank is the company name for Defendant "VSB", with its principal place of business at 4142 Hylan Boulevard, Staten Island, New York 10308, and was a willful participant in joint activity with the State or its agents.

89.    At all times referred to herein, Keith D. Christensen (hereinafter "Christensen") is the Assistant Treasurer of Victory State Bank, a citizen of the United States, who resides at 68 Raymond Avenue, Staten Island, New York 10314-2947, and was a willful participant in joint activity with the State or its agents.

90.    At all times referred to herein, Defendant Commissioner Stephen J. Fiala (hereinafter "Fiala") was employed by the Defendant The City as a supervisor, policy maker and Commissioner for the RCCO.

91.    At all times referred to herein, Defendant Fiala, as Commissioner of the RCCO, is the responsible policy maker for Defendant The City and the State of New York with respect to the management of the RCCO.

92.    At all times referred to herein, Defendant Mario Dire (hereinafter "Dire") was employed by the Defendant The City as the first deputy county clerk of Richmond County.

93.    At all times referred to herein, Defendants Fiala and Dire, individually and in their official capacities as employees of the City of New York, who are/were members of the RCCO, were involved in acts and/or omissions relating to the wrongful seizure and malicious continuing seizure of the Plaintiff Robert J. Fileccia under Richmond County Indictment No. 23/2004, subsequent cover up of the fabricated indictment, and Assistant District Attorney David Frey's mail theft ring.

94.    At all times referred to herein, Defendants Fiala and Dire, individually and in their official capacities as employees of the City of New York, who are/were members of the RCCO, acted within the scope of their employment as the Commissioner and first deputy county clerk for Defendant The City.

95.    At all times referred to herein, Defendants Fiala and Dire, individually and in their official capacities as employees of the City of New York, who are/were members of the RCCO, were acting under the color and pretense of the law, statutes, ordinances, regulations, customs, and usages of the City of New York and under the authority of Defendant The City.

96.    At all times referred to herein, Defendants Fiala and Dire, individually and in their official capacities as employees of The City who are/were members of the RCCO, were responsible for the providing of accurate and truthful information for prosecution to the

Richmond County District Attorney's Office and other prosecutorial authorities; giving truthful testimony to a grand jury or at a hearing or trial; revealing exculpatory evidence to prosecutors, a grand jury, at a hearing or trial; refraining from withholding or falsifying evidence during the plotting (investigatory) stage of a criminal proceedings, from a grand jury or at trial; refraining from misleading or deceiving law enforcement, a grand jury or petit jury; refraining from fabricating false evidence; refraining from initiating or instigating an arrest or prosecution without probable or reasonable cause; making further inquiry when reasonable in a criminal investigation (and not deviating from accepted practices in that regard); these Defendants were obliged to perform all these functions in accordance with the Constitutions and laws of the State of New York and the United States to ensure that innocent people are not arrested, prosecuted, convicted and incarcerated unjustly.

96.5) _UPON INFORMATION AND Belief, ALL of the Foregoing Individual Defendants, AT ALL times Relevant to this Action, Are citizens AND Residents of New York._

### 5. NOTICE OF CLAIM & ARTICLE 50(h) HEARING

#### COMPTROLLER THOMPSON'S VIOLATION OF THE PLAINTIFF'S RIGHT OF ACCESS TO THE COURTS

97.    Plaintiff Robert Fileccia timely served written Notice of Claim upon The City on May 7, 2007. More than thirty (30) days have passed since the service and filing of said Notice and the claim has not been settled or otherwise resolved.

98.    The City has never requested an Article 50 (h) hearing pursuant to the New York General Municipal Law.

99.    Instead, Defendants Thompson, Aaronson, Howe, Bryant, and Samuel failed to issue certain claim numbers to the Plaintiff (and his family) for more than 11 months attempting to run the clock on the Plaintiff's time to file a claim in State Supreme Court,

in violation of the Plaintiff's constitutional right of access to courts. When Thompson's delay in issuing claim numbers approached the statute of limitations, Plaintiff served him with additional written demands for claim numbers.

100.    In a letter dated May 7, 2008, Plaintiff warned Thompson that,

"Richmond County Assistant District Attorney David Frey stole United States Mail addressed to the claimants for approximately the last five (5) years in violation of 18 USCS §1708: Theft or receipt of stolen mail matter generally, and 18 USCS §1341: Frauds and swindles."

101.    In a letter dated May 8, 2008, Plaintiff admonished Thompson,

"[Y]our officers are hiding seven notices of claim in connection with a break-in and attempted theft of a million dollars ..." and "claim examiner Ben Samuel continues to provide Staten Island District Attorney Daniel Donovan with political cover for the crimes he and his assistants committed."

102.    In response, Defendants Thompson, Aaronson, Howe, Bryant, and Samuel

a)    issued false claim numbers—ghost numbers—to the Plaintiff, and

b)    corruptly disallowed one of the claims alleging it was *untimely* knowing same to be untrue.

They did this to obstruct the Plaintiff from filing a meritorious claim in State Supreme Court in violation of the Plaintiff's constitutional right of access to courts, fabricate a fraudulent defense for The City's lawyers, and assist ADA Frey to avoid detection and apprehension for committing numerous federal mail crimes more fully explained below.

103.    In a letter dated May 10, 2008, Aaronson admitted to the issuance of ghost claim

numbers and apologized to the Plaintiff for the confusion associated with the Comptroller's gross negligence or deliberate misconduct,

> "Please accept our apologies for the confusion related to the filing of your claims ... I can honestly tell you that I can't remember the last time we had problems such as you've encountered."

104. In a letter dated May 27, 2008, immediately *after* the expiration of the Plaintiffs time to file a claim in State Supreme Court, Thompson's lawyer, Allen Fitzer, Esq., issued new claim numbers for the Plaintiff and his family.

105. In a letter dated May 27, 2008, immediately *after* the expiration of the Plaintiffs time to file a claim in State Supreme Court, Samuel also admitted that he wrongfully disallowed the Plaintiff's claim and that his malfeasance was under investigation,

> "[P]lease disregard the disallowance notice that was sent to you on April 1, 2008. The disallowance has been rescinded and the status of your claim is under investigation."

106. Based upon the foregoing, Plaintiff Robert Fileccia has satisfied all conditions precedent for the filing of the within action.

## 6. ADA FREY'S MAIL THEFT RING

107. The Plaintiff's licensed private investigators have uncovered unmistakable evidence establishing the fact that in or around December 2001, ADA Frey, his paralegal Elizabeth Watts, DA operatives within the United States Postal Service and Postal Inspection Service, and private individuals conspired and acted in concert to fabricate false evidence against innocent United States citizens to falsely accuse them of crimes they did not commit in order to steal their money and property.

108.   The Plaintiff is a victim of ADA Frey's Mail Theft Ring.

A. Preliminary Facts

109.   The following preliminary facts are needed as the background to ADA Frey's criminal activity and fabrication of the Tax Indictment during the plotting (investigatory) stage of the criminal proceeding.

110.   In 1990, the Plaintiff built a new commercial building on vacant land that my elderly father had gifted to me.   The Plaintiff was a real estate lawyer who occupied the 2nd floor of the new building at 1276 Castleton Avenue in Staten Island, and my brother Richard Fileccia occupied the 1st Floor with his automobile repair facility known as CPA Motor Cars Ltd.






111. Ten years later, in July of 2000, the Plaintiff began a major alteration and converted the building into professional offices.

112. As the work progressed, the Plaintiff met Steven Orlando and Lori Orlando who agreed to purchase the building for $320,000.

113. On April 26, 2001, the parties signed two separate contracts because the alterations were incomplete; a Contract of Sale for $290,000 and an "Extras Contract" for $30,000 that itemized the remaining work the Plaintiff needed to complete. The two contracts totaled $320,000—the agreed to sales price for my building.

114. On July 18, 2001, the closing took place. Title of the premises was transferred from Plaintiff Robert Fileccia to 1276 Castleton Realty Co., which is a domestic limited liability company created by Steven and Lori Orlando for that purpose. Steven and Lori Orlando owed money on the work in progress (Extras Contract) that was substantially complete.

115. The Plaintiff filed several mail forwarding orders in the United States Postal Service on or about November 10, 2001 that instructed the USPS to send Plaintiff's mail to my home address located at 496 Willowbrook Road in Staten Island.

116. The United States Postal Service confirmed their receipt of the Plaintiff's mail forwarding orders that are Bates-stamped 500561, 500563, 500565, 500567 and 500569. See paragraph 1(g) above.

117. On or about September 11, 2001, Steven and Lori Orlando breached their agreement to make timely payments in accordance with the "Extras Contract." Steven Orlando admitted that his primary source of income, Data Comm Consulting Group Inc., lost all of its World Trade Center accounts as a result of the terrorist attacks and destruction of

the Towers.

118.   As negotiations between the parties collapsed, the Plaintiff noticed that United States mail addressed to the Plaintiff at 1276 Castleton Avenue began to disappear. My brother notified the United States Postal Service of the suspected stolen mail in a series of hand written letters Bates-stamped 500578, 500579, 500580, and 500596.

### B. ADA Frey Fabricates The Plaintiff's Criminal Intent To Evade Taxes By Stealing His Mail

119.   In July of 2002, the Plaintiff's private investigator Vincent Parco (hereinafter "Parco PI") was picking apart ADA Frey's fabricated Car Indictment and uncovering his widespread criminal activity.

120.   ADA Frey knew his manufactured Car Indictment was in a death spiral and wrote defense counsel three letters, on July 22 and 26, 2002, demanding Parco PI surrender all of his "notes, audio and video tapes." The Plaintiff refused and hired additional licensed private investigators to conduct simultaneous investigations of the District Attorney's continuing criminal enterprise.

121.   Within a week, ADA Frey contacted the DOF to develop a plan **'to get Robert Fileccia'**—to set him up for tax evasion—years before any presentation to a grand jury. The plan was approved by DA Donovan even though almost everything in it was illegal. Grand Jury minutes in the Tax Indictment confirm these indisputable facts.

| ADA Varriale: | Mr. Schenk, did you become involved in a case against Robert Fileccia ...? |
|---|---|
| Michael Schenk: | Yes, my office received a request for a participation in an investigation in August of the year 2002. And I met with ADA Frey at that time to discuss the case, and we've been working on this case since that point to present. [Schenk GX minutes at 53.] |

122. ADA Frey knew that in order to arrest, indict, and or convict the Plaintiff of tax evasion, he had to prove, *inter alia*, that the Plaintiff "willfully" evaded paying taxes allegedly due from the sale of my commercial building. See <u>Cheek v. United States</u>, 498 U.S. 192, 111 S.Ct. 604 (1991).  To do this, ADA Frey intercepted and stole tax notices that were mailed to my home and office and later falsely accused me of not answering them.

123. Investigations reveal that ADA Frey, Paralegal Watts, Steven Orlando, Lori Orlando, Data Comm Consulting Group Inc., among others, conspired and acted in concert to steal and destroy DOF tax notices and other accountable mail that was sent to the Plaintiff's home and office to fabricate evidence of the Plaintiff's criminal *intent* to evade taxes.

124. ADA Frey and his operatives fabricated this evidence during the plotting (investigatory) stage of the criminal proceeding—long before presentation to a grand jury—to wrongfully initiate the Plaintiff's seizure without probable or reasonable cause to believe the Plaintiff guilty of any crime in violation of the Plaintiff's Fourth  Amendment constitutional right to be free from unreasonable searches and seizures.

125. Grand Jury Exhibit 29 (hereinafter "GX 29") in The Tax Indictment, Bates-stamped 000101, is a NYC Department of Finance Notice of Tax Deficiency that was mailed to the Plaintiff's home demanding forty four thousand seven hundred fifty nine dollars ($44,759.42) in tax liability based upon the Plaintiff's purported capital gain on the sale of a commercial building.

126. The Plaintiff <u>never</u> received the DOF tax notice demanding $44,759.42 (or any other tax notice), which pursuant to the New York Tax Law must be sent to the taxpayer by certified mail.

127. GX 29 is the foundation of Count 14 in the Tax Indictment, the sole accusation against

the Plaintiff, which was dismissed on February 7, 2007 in favor of the accused and is the basis of the instant complaint.

128. GX 29 is a falsified document manufactured by DOF auditors and prosecutors during the plotting (investigatory) stage of the criminal proceedings years *before* presentation to a grand jury.

129. At the time GX 29 was fabricated, the DOF auditors, prosecutors and several other Defendants knew that the Plaintiff did not have a capital gain on the sale of my commercial building and therefore did not owe any taxes. The Plaintiff sustained a <u>loss</u> on the sale of my commercial building. <u>See</u> "Fabrication of The Tax Indictment During The Plotting (Investigatory) Stage" below.

### C. ADA Frey Recruits Steven Orlando, Lori Orlando and Data Comm Consulting Group Inc. to Steal the Plaintiff's Mail

130. Rosario material in The Tax Indictment reveals that the Richmond County District Attorney's Office first recruited Steven Orlando and Lori Orlando to steal United States mail for them in or around December of 2001.

131. Recorded interviews of Lori Orlando on January 5, 2006 and January 13, 2006 reveal that ADA Frey ordered her to take all United States mail addressed to Plaintiff Robert Fileccia's former law office at 1276 Castleton Avenue in Staten Island and mail it directly to ADA Frey or Paralegal Watts at the Richmond County District Attorney's Office.

132. ADA Frey, Paralegal Watts, Steven and Lori Orlando conspired and acted in concert to steal the Plaintiff's mail knowing that I had several current mail forwarding orders in place as of November 10, 2001.

133. During the recorded interview, Lori Orlando positively identified ADA Frey and Paralegal Watts as the two suspects who directed her to steal the Plaintiff's United States Mail and produced ADA Frey's business card to corroborate her testimony.

134. ADA Frey knew or reasonably should have known that it is a felony to intercept, steal, delay or destroy United States Mail.   See 18 USCS §1701: Obstruction of mails generally, 18 USCS §1702: Obstruction of correspondence, 18 USCS §1708: Theft or receipt of stolen mail matter generally, and 18 USCS §1341: Frauds and swindles.

135. In response to ADA Frey's ongoing mail theft operation, the Plaintiff retained the services of additional licensed private investigators that are former United States Postal Inspectors and consulted with active law enforcement officers.

136. On numerous dates and discreet locations, the Plaintiff and his investigators interviewed United States Letter Carrier Gabriel Cruz—the mailman that was assigned to delivery route 6 in Staten Island where Plaintiff owned and operated his law office.  Gabriel Cruz informed me that shortly after I sold my commercial building to Steven and Lori Orlando and vacated the premises (October 2001), Lori Orlando approached him and adamantly demanded all US mail addressed to the Plaintiff (and my brother) and falsely claimed we were still occupants at that address.  Lori Orlando told Cruz to disregard the Plaintiff's mail forwarding orders.

137. On January 18, 2006, during a recorded interview with Plaintiff's licensed private investigator, Lori Orlando confessed that ADA Frey instructed her to send the Plaintiff's (and my brother's) stolen mail to him and Paralegal Watts.  Lori Orlando admitted that: (a) she knew the mail she was forwarding to ADA Frey was not her mail; (b) she knew the plaintiff had current mail forwarding orders in place; (c) she used Federal Express, an

34

interstate courier, to send the Plaintiff's stolen mail to ADA Frey; (d) she paid for the Federal Express packages; and (e) did all the foregoing without the Plaintiff's knowledge or consent.

138.   United States Letter Carrier Gabriel Cruz was present for most of Lori Orlando's interview.

139.   On January 18, 2006, during a second recorded interview with the Plaintiff's investigator, Lori Orlando made a second positive identification of ADA Frey and Paralegal Watts as the two suspects who told her to steal the Plaintiff's United States Mail and produced ADA Frey's business card to corroborate her testimony.

140.   The Plaintiff's private investigator gave Lori Orlando an affidavit to sign to memorialize ADA Frey's theft of the Plaintiff's mail.

141.   Both Lori Orlando and Steven Orlando admitted to having called the District Attorney's Office immediately before their second interview with the Plaintiff's investigator.

142.   Within minutes of Steven and Lori Orlando's second interview with the Plaintiff's investigator, US Postal Inspector Richard Wolfe called Letter Carrier Gabriel Cruz on the telephone and asked him myriad questions for the purposes of intelligence gathering and damage control for the District Attorney's Office:

| | |
|---|---|
| Inspector Wolfe: | And now something else happened today, you know. So people are inquiring about that. |
| Letter Carrier Cruz: | Right. |
| Inspector Wolfe: | The DA's Office and stuff. So, they're asking me and yeah I know something but I don't know exactly what's going on. |

143.   Inspector Wolfe also told Cruz that the District Attorney's Office was inquiring "if the private investigator tried to get Steven and Lori Orlando to sign any forms or

something?"

144.    Inspector Wolfe completed his interrogation of the letter carrier by saying, "Alright, if I need anything else, I'll call you right back" indicating that he was going to have a debriefing with ADA Frey and may be receiving further instructions.

145.    On February 6, 2007, Steven Orlando testified under oath in Richmond County Supreme Court during the Plaintiff's criminal tax trial.    Orlando confessed during cross examination that he had been sending the Plaintiff's mail to ADA Frey all along at which time ADA Varriale warned, "I'm afraid we are going to get to the point where Orlando is going to need to be advised of his Miranda warnings."    Supreme Court Judge Robert Collini replied, "… is there any debate as to the fact that he sent mail [to David Frey]? ADA Varriale confirmed, "No, he sent it."  [Tr. 2/6/07 at 239.]

### D. Certified Federal Express Records Implicate ADA Frey in a Mail Theft Ring

146.    In July, August, and November of 2006, the Plaintiff lawfully obtained copies of Steven Orlando, Lori Orlando, and Data Comm Consulting Group Inc.'s Federal Express Account No. 2268-xxxx-x including United States Air Bills, package details, tracking numbers, delivery information, and scanned delivery signatures.

147.    Certified Federal Express records provided by the Federal Express Law Department Custodian of Records revealed overwhelming evidence of ADA Frey's Mail Theft Ring. The certified records list numerous US Air Bills and Packages that Steven Orlando, Lori Orlando, and Data Comm Consulting Group Inc. sent to ADA Frey and Paralegal Watts. The Federal Express packages contained the Plaintiff's stolen mail including stolen certified mail, first class mail, priority mail, and other accountable mail that is addressed

to the Plaintiff, my brother and our former businesses.

148.    The certified Federal Express Air Bills indicate ADA Frey's mail theft ring began stealing the Plaintiff's mail *before* grand juries were convened in both The Car Indictment and Tax Indictment.

149.    Immediately below is a Federal Express Air Bill from Lori Orlando to ADA Frey dated June 2, 2003 that contained stolen mail.  The June 2, 2003 Air Bill is prima facie evidence that Lori Orlando sent additional stolen mail to ADA Frey during the plotting (investigatory) stage of The Tax Indictment long *before* the prosecutors' presentation to a grand jury in January 2004.



150.    Certified Federal Express signed delivery records indicate the Richmond County District Attorney's Office received the stolen mail on June 10, 2003.



E. ADA Frey Steals Plaintiff's Sting Mail

151.    To infiltrate ADA Frey's Mail Theft Ring and prove that the Federal Express Air Bills contained stolen mail, on December 7, 2005, investigators sent *sting mail* addressed to the Plaintiff's former law office address.

152.    Certified Federal Express Air Bill No. 8455-3049-6620 reveals that Steven Orlando (and Data Comm Consulting Group Inc.) intercepted and stole the sting mail that is postmarked December 8, 2005, delayed it for three weeks until December 29, 2005, and then mailed it by Federal Express courier to Paralegal Watts in the Richmond County District Attorney's Office at 130 Stuyvesant Place, Staten Island, New York.



153. Certified Federal Express signed delivery records indicate the Richmond County District Attorney's Office received the stolen sting mail on January 3, 2006, the first business day after the New Year holiday.



154. United States Postal Service records and other evidence reveal that on January 3, 2006, ADA Frey immediately wrote *"Moved 496 Willowbrook Road"* on the outside of each of the sting mail envelopes and then dumped the sting mail back into the outgoing USPS mail attempting to avoid detection and apprehension for his criminal activity.

155. ADA Frey utilized the same artifice to defraud on other stolen mail that he had been hiding for as long as one hundred and thirty eight (138) days calculated from the postmark on the stolen envelopes.

156. The Plaintiff's private investigators lawfully recovered the stolen sting mail and other misappropriated mail.

### F. ADA Frey's Lulling Letters

157. Throughout the Plaintiff's investigation, ADA Frey sent me a series of five (5) lulling letters that were designed to lull me into a false sense of security, postpone my ultimate complaint to the authorities, and therefore make his detection and apprehension less likely than if no mailings had taken place.

158. ADA Frey used his lulling letters in furtherance of his fraudulent scheme and to facilitate concealment of it.

159. ADA Frey also designed his lulling letters to implicate his operatives Steven and Lori Orlando for the mail stolen from 1276 Castleton Avenue. In other words, ADA Frey was framing his own operatives as scapegoats for the crimes he orchestrated and committed and was preparing to throw the Orlandos 'under the bus' when they proved no longer useful to him.

160. For example, on January 18, 2005, ADA Frey admitted receiving the Plaintiff's stolen mail, intentionally implicated his operatives Steven and Lori Orlando, and arrogantly proclaimed that he will continue to steal and withhold the Plaintiff's mail *regardless* of anything I say or do:

ADA Frey:  "I just received more mail addressed to you and your brother at 1276 Castleton Avenue. ... Whenever the current owner of 1276 Castleton Avenue [Steven and Lori Orlando] forwards mail to me, you can be assured that I will always contact the most recent

retained attorney to ask him where he wants this mail sent, regardless of any requests by you."

### G.  ADA Frey Steals DMV Hearing Notices Sent to Plaintiffs Former Business Address

161.  An examination of the recovered stolen mail reveals that ADA Frey, Steven Orlando, Lori Orlando, and Data Comm Consulting Group Inc. stole numerous DMV Hearing Notices that were sent to the Plaintiff's former business address at 1276 Castleton Avenue in Staten Island.

162.  Many of the DMV notices were sent to the Plaintiff and my brother by certified mail.

163.  The recovered stolen mail indicates that ADA Frey stole the DMV hearing notices *before* they were delivered to the Plaintiff so that my brother and I would fail to appear for trial and lose by default.  In this way, ADA Frey would protect his witnesses from cross examination and his fabricated Car Indictment from detection.

164.  The prosecution witnesses in The Car Indictment and the State's witnesses in the DMV hearings are the same co-conspirators who plotted with ADA Frey to fabricate false evidence in the plotting (investigatory) stage of that proceeding.

165.  As mentioned earlier, a separate federal civil rights complaint will be filed in this Court before February 27, 2010 to address the unlawful seizures and myriad constitutional violations in The Car Indictment.

### H.  ADA Frey's Operatives Steal DOF Notices Sent to Plaintiff's Home

166.  This section pertains to ADA Frey's stealing United States mail that is addressed to my home at 496 Willowbrook Road in Staten Island, New York, 10314.

167.  On or about December 5, 2003, during litigation of a related Article 78 action in Albany County Supreme Court (Index No. 6291/03), Plaintiff uncovered several pieces of stolen

certified mail that are correctly addressed to my home at 496 Willowbrook Road in Staten Island—but which were <u>never</u> received.

168. Investigations reveal that the Plaintiff and my brother did not receive the certified mail because they were intercepted before they were delivered—not by Steven or Lori Orlando—but by another DA operative *inside* the main United States Post Office located at 550 Manor Road in Staten Island.

169. The DMV envelopes indicate they are correctly addressed to the Plaintiff's home, but were intercepted and marked "Moved Left No Address" and "Return To Sender" by someone inside the Post Office at 550 Manor Road in Staten Island.

170. United States Postal Inspector Richard Wolfe maintained a satellite office at 550 Manor Road in Staten Island.

171. As a result of the foregoing, the Plaintiff's private detectives widened the scope of their investigation. On November 12, 2008, pursuant to a Freedom of Information Law request, the Plaintiff obtained certified copies of eight (8) tax notices that the New York State Department of Taxation and Finance sent to the Plaintiff's home address at 496 Willowbrook Road in Staten Island.

172. Four of the tax notices were sent to the Plaintiff by certified mail.

173. The Plaintiff never received any of the eight (8) tax notices even though all of them were correctly addressed to 496 Willowbrook Road, Staten Island, NY 10314.

174. The Plaintiff's investigators performed a thorough investigation on the United States Postal Services "track and confirm" system and uncovered incontrovertible evidence that ADA Frey's operatives inside the United States Postal Service had sabotaged the USPS record keeping system and manipulated its entries to avoid detection and apprehension.

The sabotaged USPS track and confirm system reflects the following phony delivery addresses for the stolen certified mail:

    (a) Briarcliff Manor, New York 10510;

    (b) Bayside, New York 11361;

    (c) Albany, New York 12227; and

    (d) "There is no record of this item."

175.    It is factually impossible for the correctly addressed envelopes to be misdelivered to four different locations scattered throughout the State of New York.

176.    Furthermore, the eight tax notices request payment of taxes due for the following tax periods: (a) Notice of Determination, 6/1/01-8/31/01; (b) Notice and Demand for Payment of Tax Due, 6/1/01-8/31/01; (c) Notice of Determination, 9/1/01-11/30/01; (d) Notice and Demand for Payment of Tax Due, 9/1/01-11/30/01; (e) Notice of Determination, 12/1/01-2/28/02; (f) Notice and Demand for Payment of Tax Due, 12/1/01-2/28/02; (g) Notice of Determination, 3/1/02-5/31/02; (h) Notice and Demand for Payment of Tax Due, 3/1/02-5/31/02.

177.    Count 5 of the Tax Indictment alleges "willful failure" to file tax returns for the exact same time periods set forth in the stolen tax notices listed above.

178.    Therefore, the theft of the foregoing tax notices enabled ADA Frey to fabricate Count 5 of the Tax Indictment without probable or reasonable cause long before presentation of the fraudulent evidence to a grand jury and well within the plotting (investigatory) stage of the criminal proceedings.

### I.  ADA Frey Targets Letter Carrier Gabriel Cruz

179.    On July 14, 2005, the Plaintiff's brother Richard Fileccia had a recorded telephone

conversation with criminal defense lawyer Mark M. Baker, who briefly represented the Plaintiff in motion practice. During the telephone conversation, Richard Fileccia informed Baker that the Plaintiff was going to initiate a federal mail fraud investigation against ADA Frey.

180.    Within hours of this conversation, the United States Postal Service issued a "Notice of Removal" dated July 14, 2005 against Letter Carrier Gabriel Cruz that falsely accused the innocent mailman of "Delaying First Class Mail" on his Castleton Avenue route where the Plaintiff's former office building was located.

181.    ADA Frey and his operatives were targeting Gabriel Cruz to be the 'fall guy' for their criminal activity. However, the July 14 Notice of Removal was not an alibi for the stolen tax notices that were addressed to the Plaintiff's home at 496 Willowbrook Road in Staten Island, because the July 14 Notice of Removal pertained only to mail from the Castleton Avenue route.

182.    As a result, on October 18, 2005, someone inside the Postal Service *planted* 280 pieces of outgoing US mail in the back of Gabriel Cruz's delivery truck while it was awaiting unscheduled routine maintenance at the main United States Postal facility at 550 Manor Road in Staten Island.

183.    United States Postal Inspector Richard Wolfe maintained a satellite office at 550 Manor Road in Staten Island.

184.    Gabriel Cruz was again falsely charged with delaying first class mail.

185.    Unbeknownst to ADA Frey or his operatives, Cruz lawfully obtained photographs of the planted mail which revealed that all of their return addresses were from the Willowbrook Road delivery route, where the Plaintiff resides, and not from the Castleton Avenue

44

delivery route where Cruz was assigned. Therefore, since it was impossible for Gabriel Cruz to have access to mail from another route, he could not be guilty of leaving it in his delivery truck or of the crimes he was falsely accused of.

186. On March 6, 2006, Gabriel Cruz was found innocent of all charges.

187. On June 13, 2006, Gabriel Cruz called United States Postal Inspector Richard Wolfe located at 550 Manor Road in Staten Island—the same post office where mail was planted in Cruz's delivery truck—and told Wolfe that he wanted to file a criminal complaint against ADA Frey for stealing the Plaintiff's mail.

188. During the recorded telephone conversation, Inspector Wolfe informed Gabriel Cruz that he will not investigate the District Attorney's Office even though it is a crime for ADA Frey and Lori Orlando to have misappropriated the Plaintiff's mail. When Cruz asked Inspector Wolfe whether he should report ADA Frey's mail crimes to federal law enforcement authorities, Wolfe warned the letter carrier that he was wasting his time because the United States Attorney's Office was going to "*kick it back to him*" and he "already" determined Cruz's complaint to be unfounded. Inspector Wolfe indicated that he was going to obstruct justice and bury Cruz's complaint regardless of what Cruz said or did.

189. On August 10, 2006, Gabriel Cruz obtained documentary evidence that Inspector Richard Wolfe unlawfully sent a copy of the letter carrier's mail fraud complaint to the District Attorney's Office, apparently warning ADA Frey of an impending federal investigation.

190. The record evidence indicates that Inspector Richard Wolfe performed no investigation into Cruz's allegations against ADA Frey but instead made overt efforts to conceal Frey's criminal activity (Misprision of Felony).

J.  United States Postal Service Implicates Supreme Court
Justice Leonard Rienzi

191.    Being unable to frame the letter carrier for ADA Frey's ongoing mail fraud scheme, on June 21, 2006, USPS Manager Sandra Stern issued a "Notice of Removal" against Gabriel Cruz for his purportedly failing to appear for a fitness for duty medical examination that was intended to discredit him as a fact witness.

192.    Gabriel Cruz opposed the removal with independent medical evaluations that indicated he was "fit for duty" and was simply asking for a change in his delivery route, away from the dangerous routes where the Plaintiff's mail was being stolen.

193.    Gabriel Cruz's request for a change in his delivery route was "DENIED." [Emphasis in the original.]

194.    On June 26, 2006, Letter Carrier Cruz called Union Representative Paul Alexander to discuss his most recent Notice of Removal and asked whether the union president could help him get assigned to another delivery route.

195.    During this recorded telephone conversation, Paul Alexander informed Cruz that USPS Human Resources Manager David Rudy sent Supreme Court Justice Leonard Rienzi— who was presiding over the Plaintiff's criminal indictments—an illegal ex parte written communication concerning Gabriel Cruz's allegations against ADA Frey.

196.    Judge Rienzi did not disclose his unlawful ex parte communication to the Plaintiff Robert Fileccia or then co-defendant Richard Fileccia or our defense attorneys.  Instead, he issued apparently falsified decisions denying the Plaintiffs motions to dismiss the fabricated indictments including Judge Rienzi's failure to even consider a three-page warrantless search and seizure suppression motion that should have ended The Tax

Indictment. See "The Plumbers Team" below.

197. On July 31, 2006, Plaintiff's private investigators uncovered reliable evidence indicating that Union Representative Paul Alexander unlawfully and surreptitiously removed Gabriel Cruz's independent medical evaluations from his personnel file, which resulted in the mailman being unable to defend himself against the fraudulent "fitness for duty" charges. Paul Alexander framed Cruz for the frivolous charges and conspired with ADA Frey or his operative(s) to have him terminated from the Postal Service.

198. On August 4, 2006, Letter Carrier Cruz was unjustly fired from the United States Postal Service in retaliation for (a) reporting ADA Frey's criminal activity and (b) for his being a witness against the Richmond County District Attorney's Office in a foreseeable federal investigation concerning their theft of United States mail.

199. On October 2, 2006, the Plaintiff's investigators obtained a written statement from a USPS employee who saw USPS Manager Sandra Stern unlawfully searching Gabriel Cruz's post office box without a search warrant.

> K. The Postal Inspection Service Threatens to Arrest Gabriel Cruz to Silence Him.

200. Foreseeing a federal investigation into ADA Frey's theft of the Plaintiff's mail, on November 29, 2006, United States Postal Inspector Steven Barrientof called Gabriel Cruz under the false pretense of conducting a criminal investigation. The recorded telephone conversation reveals Inspector Barrientof was knowingly and intentionally tampering with a witness, in violation of 18 USCS §1512, §1513, and §3.

201. Inspector Barrientof told Cruz that he was a federal agent authorized to arrest people, execute search warrants, that he had a photograph of Gabriel Cruz and could easily find

and arrest him.   He warned Cruz in no uncertain terms that if he were to appear at a future arbitration, whether Department of Labor hearing or otherwise, it would be management's word against his, and if corroborated, would result in Cruz's immediate arrest.  Inspector Barrientof said, "Just be careful, if you are at an arbitration … you can be arrested."  He also professed that if someone made a complaint to the New York Police Department about Gabriel Cruz, he would have *already* been arrested because the NYPD makes arrests upon baseless allegations all the time.

202.   Inspector Barrientof then asked Gabriel Cruz a series of leading questions which led me to believe that he was tape recording the conversation and attempting to create a false self serving record to discredit Cruz as a fact witness against ADA Frey.  Without probable or reasonable cause, Barrientof falsely accused Cruz of being "paranoid" and at the "top of his very nervous list."  Inspector Barrientof asked and answered his own questions, such as "Are you OK?" … "You sure?" … while at the same time suggesting that Cruz needed to "talk to somebody."   Finally, without reasonable or probable cause, Inspector Barrientoff repeatedly voiced his concern that Cruz "was going to hurt himself," which implied that harm would come to Cruz if he were to testify against ADA Frey or his operatives.

203.   As a result of the foregoing, Gabriel Cruz was denied unemployment insurance, made to be homeless and has suffered unimaginable financial and personal ruin.

204.   The foregoing incontrovertible evidence indicates that ADA Frey's Mail Theft Ring has compromised the integrity of the local United States Postal Service and continues to be a clear and present danger to the People of Staten Island and that of the United States.  As a result, the Richmond County District Attorney's Office is engaged in racketeering

activity, as defined by Section 1961 of the Racketeer Influenced and Corrupt Organizations Act, and is classified as a continuing criminal enterprise.

### L. The Plaintiff's Ongoing Mail Theft Investigation

205. In a recorded telephone conversation on July 10, 2009, DOF lawyer David Atik admitted that he has been unlawfully withholding more than 3 inches of tax documents from the Plaintiff—including DOF envelopes that were returned to sender—and saw about 900 pages of related tax records in DOF auditor Michael Schenk's possession.

206. Although David Atik was recorded promising to immediately surrender the Plaintiff's stolen mail and other critically important tax records to me, he has knowingly and intentionally withheld this information to a) conceal ADA Frey's criminal activity (misprision of felony) and b) to violate the Plaintiff's constitutional right of access to courts.

207. The Plaintiff and my licensed detectives maintain an ongoing investigation into ADA Frey's Mail Theft Ring and the District Attorney's continuing criminal enterprise. As a result, I respectfully reserve the right, pursuant to the Federal Rules of Civil Procedure and the United States Constitution, to amend this complaint as of right, and when necessary based upon newly discovered evidence.

### M. By Fabricating Evidence, ADA Frey, Paralegal Watts, Steven Orlando, Lori Orlando, and Data Comm Consulting Group Inc. Initiated and Instigated the Plaintiff's Wrongful Seizure In Violation of the Plaintiff's Clearly Established Constitutional Rights

208. By stealing the Plaintiff's mail, ADA Frey, Paralegal Watts, Steven Orlando, Lori Orlando, and Data Comm Consulting Group Inc. fabricated evidence that initiated and

instigated the Plaintiff's unlawful seizure without probable or reasonable cause in violation of:

    a) The Plaintiff's 4th Amendment Constitutional right not to be seized without probable or reasonable cause;

    b) The Plaintiff's 4th and 14th Amendment Constitutional Right not to be maliciously prosecuted;

    c) The Plaintiff's 6th Amendment Constitutional right to a fair trial; and

    d) The Plaintiff's constitutional right not to be deprived of liberty as a result of fabrication of evidence by a government officer acting in an investigatory capacity (and or their co-conspirators), at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty.

## 7. THE PLAINTIFF'S SEIZURE

209. On January 30, 2004, the Plaintiff was wrongfully indicted for tax evasion based upon fraud, perjury, the suppression of exculpatory evidence, and other conduct undertaken in bad faith.

210. DA Donovan's signature on the indictment is prima facie evidence of his review of the fabricated evidence, perjured testimony and deliberately misleading presentation before the grand jury.

211. DA Donovan condoned and ratified his subordinates (ADAs) unconstitutional conduct, the Plaintiff's seizure and continuing seizure without probable or reasonable cause, and failed to supervise his subordinates with deliberate indifference for the Plaintiff's constitutional rights.

212. On February 2, 2004, Detective Robert Nestel (Shield No. 1192) called the Plaintiff on

the telephone and ordered me to surrender to the Staten Island District Attorney's Office on February 10, 2004 based upon an alleged arrest warrant signed by Supreme Court Justice Leonard Rienzi.

213.   The arrest warrant was not based upon probable or reasonable cause because Judge Leonard Rienzi is not, by any objective standard, a neutral magistrate. He abandoned his role as an impartial magistrate throughout The Car Indictment and Tax Indictment and became the prosecutor. See Tr. 5/11/06 Indictment 62/2002 where co-counsel Gary G. Becker, Esq. accused Judge Rienzi of advancing his own legal arguments resulting in the Court immediately recusing himself. See "The Plumbers Team" below.

214.   At 8am on the morning of February 10, 2004, Detective Robert Nestel arrested the Plaintiff at the Richmond County District Attorney's Office, 130 Stuyvesant Place, without probable cause, reasonable cause, or arguable probable cause. The Plaintiff was handcuffed behind my back and paraded through the public streets for several blocks to the nearby 120th Police Precinct (for fingerprinting and processing) to humiliate me.

215.   After processing, two armed detectives led the Plaintiff into Judge Leonard Rienzi's basement Courtroom at 18 Richmond Terrace in Staten Island.

216.   The Plaintiff was arraigned on February 10, 2004 before Judge Rienzi and was released on my own recognizance because of a one hundred thousand dollar ($100,000) bail bond that was previously secured for my release from custody on the pending Car Indictment.

Judge Rienzi:  "In light of the fact that each defendant is out on substantial bail on another indictment, each defendant has been appearing in court on a regular basis, each defendant voluntarily surrendered, because of all those factors – defendants are released on their own recognizance."
[Tr. 2/10/04 at 3, 4.]

217.   The Plaintiff was:

    a)   Ordered to personally appear every week at the bail bondsman's office to sign the weekly attendance sheet;

    b)   unable to leave the jurisdiction without district attorney authorization and leave of Court;

    c)   required to timely appear each and every time the case appeared on the Court's motion, status and trial calendars.

218.   The Plaintiff remained handcuffed throughout the arraignment.

219.   The Plaintiff's deprivation of liberty—the seizure—was effected pursuant to legal process.

220.   The Plaintiff's wrongful seizure subjected me to significant restriction of my constitutional right to travel freely.

### 8.  THE WARRANTLESS SEARCH AND SEIZURE OF PLAINTIFF'S RESIDENCE AND HOME OFFICE

#### A.  The Tax Indictment Was Manufactured from the Misuse of Evidence Seized During a Warrantless Search of the Plaintiff's Residence and Home Office.

221.   The Plaintiff's wrongful seizure and continuing seizure in The Tax Indictment is based entirely upon the prosecutors' misuse of stolen records and leads derived from a warrantless search and seizure of the Plaintiff's residence and home office at 496 Willowbrook Road in Staten Island on March 19, 2002.

222.   Paragraph 11 of the People's Voluntary Disclosure Form in The Tax Indictment dated February 9, 2004 states:

    [ X ] If checked, a search warrant was executed during the investigation of this case.

223.   The District Attorney's Voluntary Disclosure Form is prima facie evidence that the

Plaintiff's Tax Indictment relies exclusively on evidence and leads obtained during the warrantless search and seizure (break-in) at 496 Willowbrook Road in Staten Island.

224. For example, Grand Jury Exhibit 36 in The Tax Indictment is a copy of a deed from Barbara Viola to Salvatore Fileccia that was stolen from the Plaintiff's home office during the warrantless search and seizure and is Bates-stamped 603780 – 603783.  Grand Jury Exhibit 35 is a copy of a deed from Salvatore Fileccia to Robert Fileccia that was also misappropriated during the warrantless search and seizure and is Bates-stamped 603778-603779.

225. DOF auditor Michael Schenk's sworn grand jury testimony also indicates the Plaintiff's Tax Indictment relies solely upon the records that were seized during the warrantless search and seizure:

ADA Varriale:     And what did your investigation entail?

Michael Schenk:  We examined records seized in a search warrant at 496 Willowbrook Road ... and we also used compilations of some of the statistics of the search warrant, evidence of the search warrant which was compiled by the Staten Island District Attorney's Office.

226. NYPD Detective Georgette Romagnano and numerous armed detectives and unnamed Assistant District Attorneys raided the plaintiff's residence and home office on the evening of March 19, 2002 at approximately 8pm without probable cause, reasonable cause, or arguable probable cause.

227. 85-year-old Virginia Fileccia was and still is the title owner of the residential home at 496 Willowbrook Road in Staten Island.

228. Virginia Fileccia was held captive during the home invasion and did not consent to the warrantless search and seizure.  The prosecutors and police officers did not have an arrest

warrant for Virginia Fileccia.

229. There were no exigent circumstances.

230. Eyewitness testimony reveals Detective Romagnano led the warrantless home invasion and demanded cash and bankbooks from the homeowner and other occupants.

231. Eyewitness testimony reveals Detective Romagnano yelled "BINGO" during the armed robbery when she located the Plaintiff's legitimate savings account passbooks that were kept in my closed home office desk drawer.

232. Eyewitness testimony reveals Detective Romagnano failed and refused to provide the homeowner and eyewitnesses with a search warrant despite their repeated requests.

233. Eyewitness testimony reveals that one of the NYPD detectives drew his firearm on Plaintiff's unarmed brother Richard Fileccia who demanded to see a search warrant.

234. Detective Romagnano, the NYPD armed detectives, and unnamed Assistant District Attorneys burglarized the Plaintiff's home and seized property, paper and effects without probable cause, reasonable cause or arguable probable cause. See NYPD Property Clerk Invoice Nos. L044000, L044001, L044002 dated March 20, 2002.

235. More than seventeen thousand (17,000) Bates-stamped exculpatory documents were seized by the NYC Police Department during the break in—denominated "The Stolen Fileccia Records"

236. Notwithstanding Virginia Fileccia's repeated requests, Detective Romagnano failed and refused to provide the homeowner and eyewitnesses with an inventory of the property that was forcibly removed from the premises.

237. Detective Romagnano threatened to arrest an eyewitness who published her intention to take photographs and or video of the Plaintiff's home office as the armed detectives were

looting it.

238.    Detective Romagnano, NYPD armed detectives and unnamed ADAs knew that their conduct—a warrantless search and seizure—was <u>not</u> objectively reasonable and was a violation of the Plaintiff's clearly established Fourth Amendment constitutional right against unreasonable searches and seizures.

239.    The unnamed Assistant District Attorneys who took part in the warrantless search and seizure were supervising and giving legal advice and instruction to the detectives in acquiring evidence which might be used in a prosecution and were not acting in his or her advocacy capacity. The ADAs were acting in an investigatory capacity.

>    B.   Supreme Court Unseals Original Search Warrant and
>         Confirms Warrantless Search and Seizure of Plaintiff's
>         Residence and Home Office.

240.    During the criminal proceedings, ADA Varriale fraudulently claimed that Detective Romagnano's warrantless search and seizure (armed robbery) was due to a typographical error on the date of a purportedly valid search warrant that was obtained on March 15, 2002.

241.    However, on May 19, 2006, in open Court, Supreme Court Judge Steven Rooney unsealed the original search warrant for the Plaintiff's residence at 496 Willowbrook Road and confirmed that it was signed by Criminal Court Judge Alan Meyer on February 25, 2002 at 9:15am, and <u>expired</u> well before the March 19, 2002 break-in at the Plaintiff's residence and home office.   The following is a reduced scanned image of the expired search warrant.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND:    CRIMINAL TERM

PRESENT:

HONORABLE _____
ISSUING JUSTICE

## SEARCH WARRANT

### TO ANY POLICE OFFICER OF THE NEW YORK CITY POLICE DEPARTMENT:

1.    YOU ARE HEREBY AUTHORIZED and DIRECTED to search for and to seize the following property:

Evidence of enterprise corruption, conspiracy, scheme to defraud, petit larceny, grand larceny; money laundering, coercion, criminal possession of stolen property, falsifying business records, filing a false instrument, attorney misconduct, evidence of said crimes, evidence of a proprietary interest in, and use of, 496 Willowbrook Road, computers, automobiles, bank records of Robert Filaccia, Richard Filaccia, and CPA Motor, answering machines, business records relating to CPA Motor, Members Only Auto, On The Job Auto, and VIP Auto, legal documents and records relating to CPA Automotive, Members Only, On The Job Auto, and VIP Auto, and United States currency.

2.    YOU ARE HEREBY AUTHORIZED and DIRECTED to search the

Residence located at 496 Willowbrook Road, Staten Island, New York, located between Auburn Avenue and Denton Place.

3.    YOU ARE HEREBY AUTHORIZED and DIRECTED to search any and all persons located in the above said premises.

4.    This Warrant must be executed between the hours of 6:00 AM and 9:00 PM.

5.    This warrant must be executed not more than ten (10) days from the date of its issuance and any property seized pursuant hereto shall be returned and delivered to the Court without unnecessary delay.

Dated: February 25, 2002
Time: 9:15 P.M.
Staten Island, New York

_____
JUSTICE OF THE SUPREME COURT

C.   Search Warrant Log Confirms Warrantless Search and
      Seizure.

242.   On May 19, 2006, Judge Rooney ordered the unsealing of the search warrant log kept by the Clerk of the Richmond County Supreme Court, Criminal Term, which revealed the existence of both an expired search warrant dated February 25, 2002 <u>and</u> a search warrant affidavit dated February 25, 2002.   Prosecutors, Supreme Court Judges and Court personnel have not opposed this prima facie evidence and continue to secret Detective Romagnano's February 25, 2002 sworn affidavit in support of the expired search warrant.

243.   Consistent with New York Criminal Procedure Law §690.30, the February 25, 2002 search warrant required that it was to be executed within ten days from issuance.   The search and seizure of the Plaintiff's residence and home office was not conducted until March 19, 2002, well beyond the ten-day limit.   Therefore, the March 19, 2002 search and seizure was warrantless.   See <u>People v. Jacobwitz</u>, 89 A.D.2d 625, 425 N.Y.2d 679 (2nd Dep't 1982) (property suppressed where warrant was executed 17 days after its issuance).

244.   Prosecutors made no attempt to controvert the unsealed prima facie evidence of the March 19, 2002 warrantless search and seizure other than falsely claiming the February 25, 2002 date on the search warrant was a "typo."

245.   ADA Varriale did <u>not</u> produce an affidavit from the issuing magistrate, Judge Alan Meyer, or any other evidence in support of her frivolous "typo" argument.

246.   Furthermore, the February 25, 2002 search warrant was issued without probable cause, reasonable cause, or arguable probable cause.   The only affidavit in support of the application for the February 25, 2002 search warrant that ADA Varriale produced in discovery is dated March 15, 2002.   As that affidavit post-dates the February 25, 2002 search warrant by 18 days, Judge Meyer could not have relied upon it, and since no other

affidavit had been produced during the proceedings, there was no showing of probable cause for the issuance of the February 25, 2002 warrant.

### D. Prosecutors Conspire with Supreme Court to Maintain Plaintiff's Continuing Seizure (Malicious Prosecution).

247. However, despite the uncontroverted prima facie evidence of the expired search warrant revealed on May 19, 2006, Supreme Court Judge Steven Rooney did not dismiss The Tax Indictment and allowed ADA Varriale to maintain the Plaintiff's continuing seizure.  See "The Plumbers Team" below.

248. The record evidence indicates that ADA Frey and ADA Varriale conspired and acted in concert with Supreme Court Judge Steven Rooney:

   a) to conceal the warrantless search and seizure; and

   b) ADA Frey's fabrication of a phony supporting affidavit that he 'doctored'

   to remove time-date evidence when the search warrant was executed.

249. The May 19, 2006 transcript in Indictment 23/2004 reveals that before the lunch recess, Judge Rooney agreed to inspect the search warrant affidavit page by page. After the recess, however, Judge Rooney unexplainably limited the Plaintiff's inspection of the supporting affidavit to only the first and last page:

Before recess: "Why don't we do that now.  We'll get the original search warrant and affidavits in support up here.  You can give me the copy, I'll compare them." [Tr. 5/19/06 at 40.]

After recess:   "If you want to step up and take a look at it.  Here, I'll have the clerk hand it out to you, just the last page, because I don't see the need to go through these affidavits page by page." [Tr. 5/19/06 at 48, 49.]

250. ADA Varriale acquiesced and ratified the Court's misconduct in violation of the Plaintiff's Fourth amendment constitutional right to be free of unwarranted searches and

seizures and constitutional right not to be maliciously prosecuted. In so doing, she betrayed her legal and ethical obligation to uphold the law as an officer of the Court, and knowingly chose to subvert it.

### E. ADA Varriale Obstructs Justice

251.   ADA Varriale knowingly obstructed justice and made numerous attempts to conceal the foregoing warrantless search and seizure including:

    a)   Surreptitiously withholding Rosario material—Detective Romagnano's grand jury testimony in The Car Indictment—from the Plaintiff in my tax trial.  Although Detective Romagnano is listed as a prosecution witness in The Tax Indictment, ADA Varriale concealed her grand jury testimony in The Car Indictment that apparently contains the time and date of the detective's application for the February 25, 2002 expired search warrant;

    b)   Opposing the Plaintiff's January 8, 2007 meritorious motion to unseal the original stenographical notes of Detective Romagnano's oral application(s) to Criminal Court Judge Alan Myer for a search warrant dated February 25, 2002 at 496 Willowbrook Road in Staten Island, which I respectfully incorporate by reference;

    c)   Instructing and or ratifying the Supreme Court clerks obstruction of justice who prevented the Plaintiff and defense counsel from viewing the court's public file that contained the original search warrant for 496 Willowbrook Road;

    d)   Deceptively asking Supreme Court Justice Robert Collini to instruct the trial jury that the evidence seized was "pursuant to a valid search warrant ... that needs to be in there." [Tr. 2/6/07 at 71.]

### F) ADA Frey's Illegal Entry Operation

252.  Defendant ADA Frey prepared a fraudulent affidavit in support of a search warrant containing more than two hundred (200) false statements and material omissions as a means to break into Plaintiff's home to steal my money and property.

253.  During discovery, ADA Frey gave the Plaintiff a redacted copy of the 27-page affidavit that is signed by Detective Georgette Romagnano in support of her application for a search warrant for 496 Willowbrook Road in Staten Island, which is dated March 15, 2002. (It bears repeating; the unsealed original search warrant for 496 Willowbrook Road is dated February 25, 2002, was _expired_ at the time it was executed and was _not_ accompanied by an affidavit in support.)

254.  Upon inspection of the March 15, 2002 affidavit, the Plaintiff and my investigators uncovered evidence of more than two hundred (200) documented false statements and material omissions. I respectfully incorporate by reference the Plaintiff's February 17, 2006 Frank's Suppression Motion that is 100-pages long with 43 exhibits (236 pages), and 11-page reply affirmation dated April 17, 2006.

255.  The Plaintiff also obtained evidence that ADA Frey—not Detective Romagano—is the author of the fraudulent affidavit. For example, although the opening paragraphs of the affidavit states that Det. Romagnano personally interviewed all of the prosecution witnesses; it was determined that many of them were actually interviewed by ADA Frey and _not_ Det. Romagnano.

| Private Investigator: | You just walked into a Grand Jury? How were you originally contacted? |
| --- | --- |
| Mr. Archer: | Subpoenaed. |
| Private Investigator: | You were subpoenaed? |
| Mr. Archer: | Yeah. By the district attorney. |

| Private Investigator: | By the District attorney? |
|---|---|
| Mr. Archer: | Yeah ... |
| Private Investigator: | Okay. What I wanted to ask you is did you talk to anybody prior to that Grand Jury. I know you said that you were subpoenaed you went to the Grand Jury and I thank you for doing that but were you interviewed by anybody prior to you actually going to the Grand Jury and testifying? |
| Mr. Archer: | No. From who? Interviewed by who? |
| Private Investigator: | I don't know. The DA or any – okay. And – |
| Mr. Archer: | When you say "interviewed" the only interview we had was the Grand Jury when the DA explained what would happen in the Grand Jury room. |

256.    Page 8 of the affidavit also states, "Mr. Fileccia was arrested for unauthorized use of a motor vehicle, **but my office ... deferred prosecution.**" Since the NYPD, where Det. Romagnano is employed, cannot make prosecution decisions, ADA Frey is undoubtedly the author of the fraudulent affidavit.

257.    As a result of the foregoing, the search warrant for 496 Willowbrook Road, regardless of the date that appears thereon, was obtained without probable or reasonable cause that the Plaintiff committed any crime in violation of my Fourth Amendment constitutional right against unwarranted searches and seizures.

258.    ADA Frey's fabrication of evidence in the affidavit took place during the investigatory stage of the criminal proceedings, well <u>before</u> the Plaintiff's indictment.  ADA Frey gave legal advice and instruction to Det. Romagnano in acquiring evidence for the Plaintiff's unlawful seizure and was not acting in a judicial or advocacy capacity.

259.    Defendants ADA Frey and Detective Romagnano knew that their conduct—fabricating evidence and obtaining a search warrant without probable cause—was <u>not</u> objectively reasonable and was a violation of the Plaintiff's clearly established Fourth Amendment constitutional right against unreasonable searches and seizures.

9.  THE   FABRICATION   OF   EVIDENCE   DURING   THE
    INVESTIGATORY STAGE OF THE TAX CRIMINAL PROCEEDINGS

### A. Plaintiff Robert Fileccia Became an Agency Priority Target

260.  In August 2002, ADA Frey's fabricated Car Indictment was imploding.  The Plaintiff's
      private investigators were eviscerating his manufactured evidence and uncovering his
      widespread criminal activity.

261.  In response, the Plaintiff became an Agency Priority Target.  ADA Frey, DA Donovan,
      and numerous other members of the DA's Continuing Criminal Enterprise targeted the
      Plaintiff to be falsely arrested and maliciously prosecuted for tax evasion to ensure the
      continuity of the criminal enterprise and to steal his and his family's money in the
      collateral civil forfeiture proceedings.

262.  ADA Frey devised a malicious plan to frame the Plaintiff for tax evasion to unlawfully
      initiate and instigate my seizure.  He fabricated false evidence and recruited numerous
      complaining witnesses long *before* presentation to a grand jury.

263.  For example,

      a)  ADA Frey recruited the DOF in August of 2002, more than a year and a half
          *before* presentation to a grand jury in January 2004.  See DOF auditor Michael
          Shenk's grand jury testimony at page 53; and

      b)  ADA Frey fabricated false evidence in November 2001 and December 2002.  See
          "ADA Frey's Mail Theft Ring" above and Grand Jury Exhibit 26 which is a
          certified copy of the Plaintiff's 2001 tax return that was prepared by the DOF on
          December 9, 2002, more than a year *before* presentation to a grand jury.

264.  ADA Frey's plan to falsely accuse the Plaintiff of tax evasion was so audacious, extreme,

and malevolent that it could never succeed in a civilized society unless it was sanctioned and backed by the judiciary. See "The Plumbers Team" below.

### B. ADA Frey is a Complaining Witness

265.   ADA Frey is a complaining witness in The Tax Indictment.

266.   "ADA David Frey" is the first name listed on the People's witness list in The Tax Indictment, No. 23/2004.

267.   According to the grand jury minutes, ADA Varriale is the only prosecutor presenting evidence to the grand jury that began on or about January 8, 2004.

268.   ADA Frey recruited complaining witnesses and fabricated evidence during the plotting (investigatory) stage of the criminal proceedings well *before* any presentation to a grand jury.   He instigated and initiated the Plaintiff's unlawful seizure (false arrest) and malicious continuing seizure without probable cause, reasonable cause, or arguable probable cause knowing the Plaintiff to be an innocent United States Citizen in violation of the Plaintiff's Fourth, Fifth, Sixth, and Fourteenth Amendment constitutional rights.

269.   Based upon the foregoing, ADA Frey is a complaining witness that does not have absolute or qualified immunity from civil liability.

### C. Count 14 in The Tax Indictment

270.   On January 30, 2004, the Plaintiff and his brother were indicted in a seventeen-count tax indictment, No. 23/2004 that was dismissed in favor of the Plaintiff.

271.   The Plaintiff was named in Count 14.

272.   On May 8, 2006, Supreme Court Judge Leonard Rienzi severed Count 14, the sole accusation against the Plaintiff, from the remaining counts in The Tax Indictment and

ordered it tried separately.

273. Count 14 states:

THE GRAND JURY OF THE COUNTY OF RICHMOND, by this Indictment, further accuses the defendant of the crime of: False returns; personal income and earnings taxes (TL §1804(b)), committed as follows: The said defendant, Robert Fileccia, in the Borough of Staten Island, County of Richmond, City and State of New York, on or about April 15, 2002, with the intent to evade taxes imposed under article twenty two of chapter 65 and related income and earnings tax statutes, filed a false and fraudulent return and, with such intent, substantially understate on such return his tax liability under such article or such statute, and said understatement of income is greater than one thousand five hundred dollars for the tax year 2001.

274. As explained earlier, ADA Frey, ADA Varriale and the DOF auditors fabricated GX 29 during the plotting (investigatory) stage of the criminal proceeding to obtain the Plaintiff's seizure without probable or reasonable cause.

275. GX 29 states in pertinent part:

Remarks: Due to Computational Rounding, Totals May Display +\- One Cent. Taxable income is increased by $235,852.00 do to a unreported Capital Gain of $ 202,352.00 and unreported schedule ' C' income of $ 33,500.00.

276. GX 29 indicates the DOF auditors took the sales price of my commercial <u>building</u> $290,000 from a contract of sale that was seized during the warrantless search of my home (Bates-stamped 500265) and used it as their starting point.

277. The DOF auditors then subtracted my closing expenses that were comprised of title fees of $8148.09 (Bates-stamped 500299) and real estate broker fees of $14,500 (Bates-stamped 500314).

278. DOF auditors then subtracted $65,000 as my father's basis for vacant land he purchased in 1989 (Bates-stamped 603784) to arrive at their fraudulent capital gain figure of