$202,352.

> Remarks: Due to Computational Rounding, Totals May Display +\- One Cent.
> Taxable income is increased by $235,852.00 do to a unreported
> Capital Gain of $ 202,352.00 and unreported schedule " C" income
> of $ 33,500.00.

279. The DOF auditors, however, knowingly and intentionally failed to account for any of my

cost—$208,080.26—for the construction of a new building I erected on the vacant land

that my father gave me.

280. The truth is the Plaintiff lost **$7,310.35** on the sale of my building:

- Sales price $290,000,

- less Plaintiff's closing costs of $22,648,

- less Plaintiff's cost basis of $66,582 for the vacant land my father gave me,

- less Plaintiff's cost of constructing the building $208,080.26,

- Equals Plaintiff's capital loss of **$7,310.35**.

281. GX 29 also claims that the Plaintiff had unreported Schedule C income in the amount of

$33,500.

> Remarks: Due to Computational Rounding, Totals May Display +\- One Cent.
> Taxable income is increased by $235,852.00 do to a unreported
> Capital Gain of $ 202,352.00 and unreported schedule " C" income
> of $ 33,500.00.

282. The DOF auditors, however, knowingly and intentionally failed to account for any of my

expenses—$35,490.39—for performing the alteration of my building.

283. As discussed earlier, on April 26, 2001, the Plaintiff and the buyers (Steven Orlando and

Lori Orlando) signed two separate contracts for the sale of my commercial building; a

Contract of Sale for $290,000 and an "Extras Contract" for $30,000 that itemized the

remaining work the Plaintiff needed to complete on the alterations. The two contracts totaled $320,000—the agreed to sales price for my building. The buyers requested a small amount of additional work in the amount of $5000. The Orlando's remitted payments along the way totaling $33,500 for the alterations and extra work leaving a balance due of $1500 which they never paid.

284.   The truth is the Plaintiff lost **$1,990.39** on the alteration of my building:

- Payments remitted by the Buyers for the alterations: $33,500,

- less Plaintiff's out of pocket cost for the alterations: $35,490.39,

- Equals Plaintiff's Schedule C loss of **$1,990.39**.

285.   In a recorded telephone conversation on January 19, 2007, DOF audit group chief Michael Schenk admitted that his team of auditors intentionally failed to account for the plaintiff's cost of constructing the entire building on the site because the auditors were purportedly "not sure who had constructed that building."

| Robert Fileccia: | But two years ago when you ran these figures, you were responsible for these figures the first round too, right? |
|---|---|
| Michael Schenk: | Sure. |
| Robert Fileccia: | Okay.   And when you did that you never took into consideration that even a building existed, right, but now you do, you are? |
| Michael Schenk: | **Well, the reason for that is we were not sure who had constructed that building.** We were – at the time. So, you know, it might have been that the motor car company constructed that building. We didn't know who constructed the building. [Tr. 1/19/07 at 20.] |

***

| Robert Fileccia: | Okay. Another question I had was, it escaped me for  a second.  Oh, umm, the deeds, the public documents you're going according to, the deeds stated that – on the deed, on the face of the deed it says "vacant land" in big letters, "vacant land".  Now, all along, I mean, the District Attorney's Office knew that there was a building on that vacant land. |

| | |
|---|---|
| Michael Schenk: | Oh, we knew that too. |
| Robert Fileccia: | You knew there was a building on the vacant land too? |
| Michael Schenk: | **Yes. But we didn't know who built it?** |
| Robert Fileccia: | So, therefore you couldn't take – you didn't know who built it so therefore the cost of it could have been to – to – to anybody? |
| Michael Schenk: | Well – |
| Robert Fileccia: | Meaning whoever built it? |
| Michael Schenk: | Right. |
| Robert Fileccia: | Right. |
| Michael Schenk: | You know, and we had two possibilities here. [Tr. 1/19/07 at 72, 73.] |

286.    In the same recorded conversation, Schenk also admitted that a team of DOF auditors were responsible for the fraudulent calculations and thereby initiated and instigated the Plaintiff's wrongful seizure and malicious prosecution.

| | |
|---|---|
| Robert Fileccia: | Umm, was there a team of guys on this or just – |
| Michael Schenk: | Well – |
| Robert Fileccia: | Or just you and Mr. Arena? (phonetic) |
| Michael Schenk: | No.  There was a team of people on this. |
| Robert Fileccia: | On this? |
| Michael Schenk: | When we did the initial work. |
| Robert Fileccia: | Right. |
| Michael Schenk: | Right, there was, you know, more than myself and Fred. |
| Robert Fileccia: | Right … are there any tax lawyers in your group or just auditors? |
| Michael Schenk: | Auditors. |
| Robert Fileccia: | Auditors. |
| Michael Schenk: | Uh-huh.  [Tr. 1/19/07 at 93, 94.] |

287.    On or about February 1, 2007, an incomplete copy of the grand jury minutes was given to the Plaintiff during trial.

288.    Grand jury testimony, exhibits, Rosario material, and recorded conversations indicate that

ADA Frey recruited DOF auditors Michael Schenk, Raymond Tessiello, Alfred Arena, Harry Moses, Charles Cutaia, Robert Stahl, and Maureen Kokeas as complaining witnesses to fabricate evidence—including GX 29—against the Plaintiff to initiate and instigate the Plaintiff's unlawful seizure and malicious prosecution without probable or reasonable cause in violation of:

   a) The Plaintiff's 4th Amendment Constitutional right not to be seized without probable or reasonable cause;

   b) The Plaintiff's 4th and 14th Amendment Constitutional Right not to be maliciously prosecuted;

   c) The Plaintiff's 6th Amendment Constitutional right to a fair trial; and

   d) The Plaintiff's constitutional right not to be deprived of liberty as a result of fabrication of evidence by a government officer acting in an investigatory capacity (and or their co-conspirators), at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty.

289. The Defendants ADA Frey, ADA Varriale, Schenk, Tessiello, Arena, Moses, Cutaia, Stahl, and Kokeas failed to make reasonable inquiry as to *who* constructed the building at 1276 Castleton Avenue and therefore proceeded without probable cause, reasonable cause or arguable probable cause to falsely accuse the Plaintiff of tax evasion.

290. The Defendants ADA Frey, ADA Varriale, Schenk, Tessiello, Arena, Moses, Cutaia, Stahl, and Kokeas failed to make any inquiry as to *who* constructed the building at 1276 Castleton Avenue and therefore proceeded without probable cause, reasonable cause or arguable probable cause to falsely accuse the Plaintiff of tax evasion.

291. Defendants ADA Frey, ADA Varriale, Schenk, Tessiello, Arena, Moses, Cutaia, Stahl,

and Kokeas did nothing to investigate the allegations they brought against the Plaintiff, did nothing to corroborate them, or pursue claims that the Plaintiff was innocent.

292.   Defendants ADA Frey, ADA Varriale, Schenk, Tessiello, Arena, Moses, Cutaia, Stahl, and Kokeas fabricated evidence during the plotting (investigatory) stage of the criminal proceedings long before presentation to a grand jury to frame the Plaintiff for tax evasion.

293.   Grand jury testimony, exhibits, Rosario material, and recorded conversations indicate that Defendants ADA Frey, ADA Varriale, Schenk, Tessiello, Arena, Moses, Cutaia, Stahl, and Kokeas conspired and acted in concert to manufacture false and misleading auditing and accounting reports, summaries and schedules—including GX 29—to cause the initiation, instigation and continuation of the claimant's false arrest, false imprisonment and malicious prosecution.

294.   Throughout the conspiracy, Defendants ADA Frey, ADA Varriale, Schenk, Tessiello, Arena, Moses, Cutaia, Stahl, and Kokeas pursued their malicious and unlawful objectives without probable or reasonable cause to believe claimant guilty of any crime.

295.   As a result of the foregoing, Defendants ADA Frey, ADA Varriale, Schenk, Tessiello, Arena, Moses, Cutaia, Stahl, and Kokeas violated the Plaintiffs Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment constitutional rights.

### D. ADA Frey, ADA Varriale and DOF Auditors Were In Possession of More Than 1000 Exculpatory Documents

296.   Defendants ADA Frey, ADA Varriale, and the DOF auditors knew the Plaintiff was not guilty of tax evasion years before presentation to a grand jury. They were in possession of more than one thousand (1000) exculpatory documents that were seized during the March 19, 2002 warrantless break-in and armed robbery of the Plaintiff's residence and

home office including the following:

a) Alteration Expense File: A 308-page file containing a detailed report of expenses I incurred to perform the alterations on my commercial building including hundreds of invoices and paid bills to suppliers and licensed trades. Most of the invoices were paid by the Plaintiff's credit card, signed and authorized by Robert Fileccia. The file can be found in The Stolen Fileccia Records Bates-stamped 604613-604920. A four-page "Expense Report" totaling $35,490.39 is Bates-stamped 604613-604616.

b) New Construction Buildings Department File: A 188-page construction file containing evidence of new construction at 1276 Castleton Avenue; includes building plans, new construction permits, new construction applications and related materials. The file can be found in The Stolen Fileccia Records Bates-stamped 603515-603702.

c) Vacant Land Purchase File: A 114-page real estate closing file for my later father's purchase of vacant land at 1276 Castleton Avenue in Staten Island. The file can be found in The Stolen Fileccia Records Bates-stamped 603703-603816.

d) Alteration Buildings Department File: A 48-page file containing Buildings Department documents that indicate a major alteration was performed on my commercial building in the years 2000 and 2001. The file can be found in The Stolen Fileccia Records Bates-stamped 400127-400174.

e) Litigation File: A 168-page file concerning the Plaintiff's litigation with a local general contractor, who defaulted on the construction of my building

in 1990. The file contains cost of construction estimates and pleadings that reveal payments of $82,000 to the builder. The file can be found in The Stolen Fileccia Records Bates-stamped 401846-402013.

f) DOF ICIP File: A 5-page file containing applications the Plaintiff registered with the DOF for tax abatement eligibility on the building I erected at 1276 Castleton Avenue. The file contains cost of construction estimates and letters where I notified the DOF that Plaintiff Robert Fileccia was the true owner and builder of the new building at 1276 Castleton Avenue.

297. In a recorded telephone conversation on January 19, 2007, DOF audit group chief Michael Schenk admitted seeing all of the foregoing exculpatory evidence but concocted a deceitful and incredible excuse that the foregoing exculpatory evidence was purportedly "too old" for him to use in his calculations.

| | |
|---|---|
| Robert Fileccia: | How about this – the three hundred – hold on. The documents on the alternation, let's talk about that for a moment. The documents on the alteration, its 308 invoices from memory I'm guessing, from the motion that I filed. |
| Michael Schenk: | Uh-huh. |
| Robert Fileccia: | Did David Frey give you that three years ago? He had them. He had all 300 invoices. |
| Michael Shenk: | Well he gave us whatever was in the search warrant. |
| Robert Fileccia: | Right. |
| Michael Schenk: | So it was in there. |
| Robert Fileccia: | What's that? |
| Michael Schenk: | It was in the boxes |
| Robert Fileccia: | Right. So those 308 invoices were there but you didn't account for all that alteration back then? |
| Michael Schenk: | Well … |

Robert Fileccia:     Well what, you didn't account for any of that?

Michael Schenk:    They might have – they might have been – they might have been inside of the – they might have been inside of the building folders which we were – which were, you know, I don't, you know, which were, uhh, you know, dated before the time limit, you know. [Tr. 1/19/07 at 76, 77]

                              ***

Robert Fileccia:     But if it wasn't in there, would you feel misled by prosecutors not giving you that important information?  Because doesn't that prove in a way that this guy has all these expenses so this figure that he is getting charged with under reporting income is inaccurate because they didn't give me these figures, these invoices, 308 of them.  Isn't that misleading?

Michael Schenk:    Umm –

Robert Fileccia:     I mean, you personally, not nobody else.  You're the guy who's in charge there meaning in terms of calculating things.

Michael Schenk:    Well, they gave – they gave us everything they had.  You know, it wasn't – it wasn't that they said here's ten boxes only look at these eight.

Robert Fileccia:     Right.

**Michael Schenk: Whatever they had, we looked at.**

Robert Fileccia:     Right.

Michael Schenk:    When we looked at it we said, "oop, this is too old" then we didn't go further … Yeah, we – we – we got all the boxes, including the box with your faxphone in it.  [Tr. 1/19/07 at 80].

> E.  DOF Auditor Michael Schenk Knowingly Commits Perjury before the Grand Jury to Initiate and Instigate the Plaintiff's Seizure and Malicious Prosecution.

298.    The grand jury minutes reveal that complaining witness DOF auditor Michael Schenk intentionally committed perjury and made materially false and misleading statements to the grand jury to initiate and instigate the Plaintiff's seizure and malicious prosecution in violation of the Plaintiff's 4th Amendment right to be free from unwarranted searches and seizure and constitutional right not to be maliciously prosecuted.

299.    During his sworn testimony, Defendant Schenk concealed the Plaintiff's cost of constructing the entire commercial building that I erected on vacant land at 1276

Castleton Avenue in Staten Island.

300.    During his sworn testimony, Defendant Schenk repeatedly switched the words "**building**" and "**property**" to confuse the grand jury so they would not understand whether he was talking about the sale of a building or the sale of vacant land.

Michael Schenk:    The third phase of the investigation was the sale of – the ownership and sale of the **building** itself at 1276 Castleton Avenue …

[GX] Number 36 is a deed dated the 12th day of May, 1983. It is between Barbara Viola and Salvatore Fileccia. It is for the transfer of the **property** at 1276 Castleton Avenue … the sales price of this **property** was transferred at $65,000 …

The second document, number – Exhibit number 35, is a deed dated the 25th day of November 1989, between Salvatore Fileccia and Robert Fileccia, where the **property** was transferred into the hands of Robert Fileccia …

Mr. Robert Fileccia now assumes the basis of Mr. Salvatore Fileccia, which is $65,000 as of 1989 … [Schenk GX testimony at 62, 63.]

301.    When Defendant Schenk said "Mr. Robert Fileccia now assumes the basis of Mr. Salvatore Fileccia, which is $65,000 as of 1989," he knew that the Plaintiff's father bought vacant land for $65,000 because the deed says "VACANT LAND." See GX 36.

302.    However, despite Schenk knowing that the vacant land cost $65,000, he committed perjury and corruptly told the grand jury that the Plaintiff's **building** cost $65,000.

Michael Schenk:    We then examined a contract of sale for the building that was executed on July 18, 2000 …

These documents, which have a contract of sale in them, reveal the building at 1276 Castleton Avenue was sold for $290,000 on July 18 year 2001.

We therefore did a calibration for Mr. Robert Fileccia to calculate what his capital gain would have been on that **building starting with his $65,000 basis price** as compared to the $290,000 selling price, take out certain closing costs and things. And we determined that there was a profit made on that sale of $202,000.

> We checked Mr. Fileccia's personal income tax return, and we found that this sale was not reported for income tax purposes. [Schenk GX testimony at 65.]

303.   Defendant Schenk intentionally deceived the grand jury and led them to believe that the Plaintiff inherited a commercial building that cost only $65,000 and then sold it for $290,000, generating an unreported capital gain of $202,000.

304.   Defendant Schenk knowingly concealed the Plaintiff's actual cost of constructing the building of $208,080.26 from the grand jury, which in reality generated a **loss** for the Plaintiff.

305.   Moreover, being in possession of a 308-page file containing the Plaintiff's itemized list of expenses for the renovation of the commercial building (including hundreds of invoices and paid bills to suppliers and licensed trades), Schenk testified falsely before the grand jury that "we did not see any substantial amount of purchases invoiced made by Mr. Fileccia for the renovation of this property" and Steven Orlando "supplied most of those raw materials." Schenk did this to fabricate false evidence that all of the money Orlando paid for the renovation ($33,500) was unreported taxable profit to Robert Fileccia.

> ADA Varriale:    Were any other deals that you're aware of made in connection with the sale of the property?
>
> Michael Schenk:    Yes.    On an interview with Mr. Orlando, who was the purchaser of the building, he said that there was a side agreement for renovations to the building after the July closing. And we examined his records of those transactions and – plus checks that were made payable to Mr. Robert Fileccia. Those checks totaled $ 33,500 …
>
> Okay, these --- these indicated to us that Mr. Fileccia had performed a repair renovation on this building at a contracted price. **We did not see any substantial amount of repairs or purchases invoiced made by Mr. Fileccia for the renovation of this property. Mr. Orlando had stated that he had supplied most of those raw materials.** Therefore, this was more or less the charge of the installation, which

> would have been the work Mr. Fileccia would have done himself.
>
> We determined he didn't report any of that income as well on his 2001 tax return, and we added that into our calibration for this 2001 tax year.

306.   Defendant Schenk knowingly and maliciously provided false, misleading and perjurious testimony to the grand jury, intentionally withheld material and relevant exculpatory evidence from the grand jury, and played a catalytic role in the Plaintiff's wrongful seizure and malicious continuing seizure.

307.   ADA Varriale suborn Schenk's perjury in violation of the Plaintiff's constitutional rights, including my Fourth Amendment right not to be maliciously prosecuted and Sixth Amendment right to a fair trial.

### F. DOF Auditor Alfred Arena Commits Perjury before the Grand Jury to Initiate and Instigate the Plaintiff's Seizure and Malicious Prosecution.

308.   ADA Frey and ADA Varriale recruited DOF auditor Alfred Arena to corroborate Schenk's perjured testimony.

309.   GX 29 indicates that Alfred Arena was one of the DOF auditors who prepared the fraudulent document.

310.   Defendant Arena testified falsely before the grand jury that the Plaintiff had an "unreported capital gain of $202,352" and unreported income of "$235,852."

> ADA Varriale:   I'm going to ask you to look at Exhibits 29, 30, 31, and 32 which have been previously marked for Identification. Do you recognize those documents?
>
> Alfred Arena:   Yes I do.
>
> ADA Varriale:   What do you recognize them to be?

| Alfred Arena: | Ok, these are the assessments that I calculated from the additional income for Robert and Mary Fileccia for the year 2001. |
| ADA Varriale: | That's Grand Jury Exhibit Number 29? |
| Alfred Arena: | Right. And on that assessment for tax period 2001, taxable income was increased by $235,852. And that was due to an unreported capital gain of $202,352 on the sale of this building, when Robert Fileccia sold the building in July of 2001 to Mr. Orlando who owned Datacom. |

311.   Arena intentionally failed to make a complete and full statement of facts to the grand jury, deliberately withheld and suppressed exculpatory evidence he knew to exist from the grand jury, and intentionally misrepresented and falsified evidence to initiate and advance the Plaintiff's wrongful seizure and malicious prosecution.

312.   Arena did this without probable or reasonable cause in violation of the Plaintiff's Fourth Amendment constitutional right to be free from unwarranted searches and seizures and constitutional right to not be maliciously prosecuted.

### G. Steven Orlando Testified Falsely Before the <u>Grand Jury</u> to Initiate and Instigate the Plaintiff's Seizure and Malicious Prosecution

313.   Defendant Steven Orlando was a willing participant in the criminal conspiracy with Defendants ADA Frey, ADA Varriale, ADA Bousquet, Schenk, Tessiello, Arena, Moses, Cutaia, and Stahl to manufacture false evidence against the Plaintiff and knowingly testify falsely before both the grand jury <u>and</u> trial jury to initiate and instigate the Plaintiff's unlawful seizure and malicious prosecution without probable or reasonable cause in violation of:

   a) The Plaintiff's 4th Amendment Constitutional right not to be seized without probable or reasonable cause;

   b) The Plaintiff's 4th and 14th Amendment Constitutional Right <u>not</u> to be maliciously

prosecuted;

c) The Plaintiff's 6th Amendment Constitutional right to a fair trial; and

d) The Plaintiff's constitutional right <u>not</u> to be deprived of liberty as a result of fabrication of evidence by a government officer acting in an investigatory capacity (and or their co-conspirators), at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty.

314.  Defendants ADA Varriale and Steven Orlando conspired and acted in concert to deceive the grand jury.  ADA Varriale asked Steven Orlando a series of rehearsed leading questions designed to solicit materially false and misleading responses.

315.  Defendant Steven Orlando falsely averred that when the Plaintiff sold him the commercial building at 1276 Castleton Avenue, all of the closing checks and money were paid directly to Robert Fileccia, when in reality; $92,675.95 was paid to the plaintiff's brother Richard Fileccia.

| ADA Varriale: | Were you present at the closing? |
|---|---|
| Steven Orlando: | Yes. |
| ADA Varriale: | Who else was present? |
| Steven Orlando: | My wife, my attorney and Robert Fileccia. |
| ADA Varriale: | Were the checks made directly to Robert? |
| Steven Orlando: | Yes. |
| ADA Varriale: | Was that at his request? |
| Steven Orlando: | At his request. |
| ADA Varriale: | Even the check for the extras? |
| Steven Orlando: | That was made directly to him. |

316.  Defendant Steven Orlando did this to trick the grand jury into believing that <u>all</u> the money from the sale of the building was paid to Robert Fileccia and therefore had to be reported on the Plaintiff's 2001 tax return.  Otherwise, if the grand jury knew the truth—

that Richard Fileccia received $92,675.95 from the sale of the building—then the Plaintiff's income would have to be reduced by an equivalent amount which would expose the falsity of the allegations, auditor's testimony, and fabricated grand jury exhibits (including GX 29).

317.   Defendant Steven Orlando knew that he paid Richard Fileccia $92,675.96 and that he testified falsely to the grand jury because, *inter alia*,

   a) Steven Orlando was present at the closing and signed a "Disbursement Authorization Form" authorizing Fleet National Bank to pay Richard Fileccia $92,675.96.  See GX 33, Bates-stamped 1905;

   b) Steven Orlando received a copy of the $92,675.96 check that Fleet National Bank paid to Richard Fileccia.  See GX 33, Bates-stamped 1929; and

   c) Steven Orlando received a closing statement from Fleet National Bank listing the $92,675.96 check that was paid to Richard Fileccia. See GX 33, Bates-stamped 2039-2041 and 1758-1760.

318.   In a recorded telephone conversation on January 24, 2007, Schenk admitted that the prosecution team—including ADA Frey, ADA Varriale and the other DOF auditors—also knew that some of the money from the sale of the building went to the Plaintiff's brother Richard Fileccia.

| Robert Fileccia: | So, knowing that I sold the building – that didn't give you any information in terms of knowing that I perhaps built the building? … |
|---|---|
| Michael Schenk: | Hold on, also we saw where the distribution of money went. |
| Robert Fileccia: | Right. |
| Michael Schenk: | **Some went to you and some went to your brother.** |
| Robert Fileccia: | Okay. |

| Michael Schenk: | So we had, uhh, you know, there was something conclusive. Had it all gone to you we might have said, "Oh, it must be his building." … |
| Robert Fileccia: | **And the DA was aware of those facts, right?** |
| Michael Schenk: | **Yeah.** |
| Robert Fileccia: | Okay. |
| Michael Schenk: | I mean, it was – like you said, we had – we had the evidence of the transaction. |

319.   However, on February 6, 2007, notwithstanding this exculpatory evidence, ADA Varriale asked Steven Orlando leading questions designed to solicit his false testimony and deliberately suborn his perjury.

### H) Steven Orlando Testified Falsely Before the <u>Trial Jury</u> to Maintain the Plaintiff's Continuing Seizure (Malicious Prosecution)

320.   On February 6, 2007, Steven Orlando knowingly and intentionally committed perjury before the trial jury and withheld material and relevant exculpatory evidence. He did this to maintain the Plaintiff's malicious prosecution, in violation of the Plaintiff's Fourth Amendment constitutional right not to be maliciously prosecuted and Sixth Amendment right to a fair trial.

321.   ADA Bousquet and Steven Orlando conspired and acted in concert to conceal from the jury a $92,675.95 check that Steven Orlando authorized his lender, Fleet National Bank, to pay Richard Fileccia. ADA Bousquet asked Steven Orlando a series of rehearsed leading questions in order to solicit a false response.

322.   In the end, Steven Orlando lied directly to Supreme Court Judge Robert Collini's face when he said that he gave the jury "all" of the checks he used to purchase the Plaintiff's commercial building. He and ADA Bousquet were hiding the $92,675.95 check that was paid to Richard Fileccia.

| | |
|---|---|
| ADA Bousquet: | I wanted to call your attention to April 26, 2001.   Did you enter into a written contract with Robert Fileccia? |
| Steven Orlando: | Yes. … |
| ADA Bousquet: | Judge, at this point I marked it as one exhibit, People's exhibit 6, which is inclusive of seven checks. … Can you describe what you have in front of you, what these checks are? |
| Steven Orlando: | Each one, individually? |
| Judge Collini: | What do you have in front of you? |
| Steven Orlando: | Checks. |
| Judge Collini: | Copies of checks? |
| Steven Orlando: | Copies of checks. |
| Judge Collini: | What do they relate to? |
| Steven Orlando: | The first check is a deposit – |
| Judge Collini: | **Don't tell me what they all are.  Just tell me what they are about, what they have to do with what we are talking about.** |
| Steven Orlando: | **They are all for the sale of the building, the extras contract.** |
| Judge Collini: | **Those are all the checks you used for this incident, this purchase?** |
| Steven Orlando: | **Yes, yes.** [Tr. 2/6/07 at 145.] … |
| Judge Collini: | How many pages are there? |
| Steven Orlando: | Seven. |
| Judge Collini: | 6A, B, C, D, E, F, and G. If you want to do that, mark them all individually like that A through G. … |
| ADA Bousquet: | Referring to People's Exhibit 6A, can you tell the jury what that check is? |
| Steven Orlando: | This was the first deposit check, 10 percent of the building, purchase of the building. |
| ADA Bousquet: | And what was the amount of the check? |
| Steven Orlando: | $29,000. |
| Judge Collini: | Down payment on the contract? |
| Steven Orlando: | Yes, 10 percent… |
| Steven Orlando: | 6B is for $500.  That was the down payment for the extras contract… |

| | |
|---|---|
| Steven Orlando: | 6C is for $43,000, that was at the closing, payment at the closing for the rest of the money we had to put down on the building… |
| Steven Orlando: | 6D was a tax adjustment that I owed Robert Fileccia at closing that we had to pay back. |
| ADA Bousquet: | In what amount was that? |
| Steven Orlando: | $633… |
| Steven Orlando: | 6E is for $20,000, $20,000 applied to the $30,000 extras contract… |
| ADA Bousquet: | These checks are all made out to Robert Fileccia? |
| Steven Orlando: | The first two, A and B were made out to Robert Fileccia as attorney, they went into his escrow.  The other ones are all made out to Robert Fileccia… |
| Steven Orlando: | 6F is for $10,000, $10,000 applied now to the $30,000 extra contract which put me at $30,500… |
| Steven Orlando: | 6G was another $3000 for extras, to the extras contract… |
| ADA Bousquet: | What was that, what was that check paid to Robert Fileccia for? |
| Steven Orlando: | It was paid as $3000 towards the oral agreement that was made. |
| ADA Bousquet: | I have no further questions.  [Tr. 2/6/07 at 146-149.] |

I.  Keith D. Christensen Testified Falsely Before the Grand Jury to Initiate and Instigate the Plaintiff's Seizure and Malicious Prosecution

323.  Defendant Keith D. Christensen, Assistant Treasurer of Victory State Bank, is a complaining witness, who knowingly and intentionally committed perjury before the grand jury to initiate and instigate the Plaintiff's wrongful seizure and malicious continuing seizure in violation of the Plaintiff's Fourth Amendment constitutional rights.

324.  Defendant Christensen's false statements are revealed when one examines Grand Jury Exhibit No. 12 (GX 12) at the same time you read Christensen's grand jury testimony.

325.  Defendant Christensen conspired and acted in concert with ADA Varriale to deceive the Grand Jury into believing that Plaintiff Robert Fileccia was the owner of two bank

accounts at Victory State Bank that contained all of the money from the sale of my commercial building.

326.  The truth is that the Plaintiff's brother Richard Fileccia owned one of the two bank accounts at Victory State Bank. Richard Fileccia's bank account contained $92,675.95 that Steven Orlando authorized his lender, Fleet National Bank, to pay him at the closing.

327.  Defendant Christensen did this to reinforce the prosecutor's false allegations that Plaintiff Robert Fileccia was the recipient of all the money from the sale of 1276 Castleton Avenue and failed to report it on my 2001 tax return. However, if the grand jury knew the truth—that Richard Fileccia received $92,675.95 from the sale of the building and deposited it in Victory State Bank—then the Plaintiff's income would have to be reduced by an equivalent amount which would have exposed the falsity of the allegations, auditor's testimony, and fabricated grand jury exhibits.

328.  When testifying, Christensen quotes information directly from Richard Fileccia's savings account No. 702-003347, Bates-stamped 000038—including a withdrawal of $90,000 on November 5, 2001—but falsely avers that the account is owned by Robert Fileccia.

329.  To complete the set up, Christensen falsely testifies that Robert Fileccia's social security number (059-xx-xxxx) appears on the account even though Richard Fileccia's name and social security number are clearly depicted thereon, Bates-stamped 000038.

330.  When questioned by three grand jurors to clarify, Christensen repeats his false statements a second time for their edification thereby corroborating his perjury and conspiracy to violate the Plaintiff's Fourth Amendment constitutional rights.

331.  Defendant Christensen's false testimony was deliberate, premeditated, rehearsed, and with malice aforethought.

332.    Defendants Victory State Bank and VSB BANCORP, Inc. were grossly negligent in managing and supervising Defendant Christensen who caused and procured the Plaintiff's unlawful seizure and continuing malicious seizure without reasonable or probable cause that I was guilty of any crime.

333.    Defendants Victory State Bank and VSB BANCORP, Inc. failed to adequately train and supervise Defendant Christensen relating to:

    a) his obligation to refrain from fabricating evidence;

    b) his obligation to refrain from committing perjury;

    c) his obligation to refrain from withholding exculpatory evidence;

    d) his obligation to refrain from making misleading statements to a grand jury or trial jury;

    e) his obligation to disclose exculpatory evidence;

    f) his obligation to avoid the use of fabricated evidence;

    g) his obligation to avoid framing innocent US citizens;

    h) his obligation to avoid accepting bribes or other form of compensation in return for convicting innocent US citizens.

334.    Defendants Victory State Bank and VSB BANCORP, Inc.:

    a) knew to a moral certainty that Defendant Christensen would confront the particular situations described in (a) through (h) above;

    b) knew the situations described in (a) through (h) above presented Defendant Christensen with a difficult choice of the sort that training or supervision would make less difficult or that there is a history of employees mishandling the situation;

    c) knew that the wrong choice by Defendant Christensen frequently causes constitutional deprivations.

335.   Defendants ADA Varriale, ADA Frey, and Christensen conspired and acted in concert to cause and procure the Plaintiff's seizure and malicious continuing seizure without probable or reasonable cause in violation of the Plaintiff's Fourth Amendment constitutional right against unwarranted searches and seizures and constitutional right not to be maliciously prosecuted.

336.   Defendants ADA Varriale, ADA Frey, DA Donovan and other members of the District Attorney's continuing criminal enterprise bribed, provoked, threatened, or otherwise influenced a commercial bank—Defendants Victory State Bank and VSB BANCORP, Inc.—to join their criminal conspiracy and assist them in attempting to steal more than one million dollars from the Plaintiff and my family in the collateral civil forfeiture proceedings.

> J. Mario Dire Testified Falsely Before the <u>Trial Jury</u> to Maintain the Plaintiff's Continuing Seizure (Malicious Prosecution)

337.   Mario Dire is the First Deputy County Clerk of Staten Island.

338.   On February 6, 2007, Mario Dire knowingly and intentionally committed perjury before the trial jury and withheld material and relevant exculpatory evidence. He did this to maintain the Plaintiff's malicious prosecution, in violation of the Plaintiff's Fourth Amendment constitutional right not to be maliciously prosecuted and Sixth Amendment right to a fair trial.

339.   People's Exhibit 1 is a deed from Barbara Viola to Salvatore Fileccia, representing VACANT LAND that my father bought on May 12, 1989 for $65,000.

340.   People's Exhibit 2 is a deed from Salvatore Fileccia to Plaintiff Robert Fileccia, representing a father-son gift transfer of the same VACANT LAND to the Plaintiff on November 25, 1989.

341.   People's Exhibit 3, however, is a deed representing the Plaintiff's sale of my commercial BUILDING to Steven Orlando's real estate holding company, 1276 Castleton Realty Co., LLC on July 18, 2001 for $290,000.

342.   Defendant's ADA Varriale, ADA Frey, and ADA Bousquet bribed, threatened or otherwise influenced Dire to lie under oath and hide the Plaintiff's newly constructed building from the jury that cost me $208,080.26 to erect.

 

343.   ADA Bousquet asked Dire a series of leading questions designed to create the false impression that Plaintiff Robert Fileccia received vacant land with a value of $65,000 and sold the same vacant land for $290,000 resulting in a huge profit—in excess of $200,000 —for the Plaintiff.

| ADA Bousquet: | Can you look at People's 1 for identification. |
| The Court: | Do you know what that document is? |
| Mario Dire: | Yes I do ... It's a certified copy of a deed which was recorded in the office of the Richmond County Clerk on June 21st of 1989 ... |
| The Court: | Does it have an address? |

| Mario Dire: | It indicates that it was a premises on Castleton Avenue, but in parenthesis it then indicates vacant land … |
| ADA Bousquet: | I'm showing you People's Exhibit number 2 for identification. Can you tell the Court what that is? … |
| Mario Dire: | This particular document lists a premises of 1276 Castleton Avenue. |
| ADA Bousquet: | And you indicate that the description makes it the same property that was referred to in People's Exhibit number 1? |
| Mario Dire: | The block and lot are the same as the prior deed … |
| ADA Bousquet: | Mr. Dire, can you tell the jury what that item is, People's Exhibit number 3? … |
| Mario Dire: | The property is listed by block number 213, lot number 27. |
| ADA Bousquet: | **Is that the same property as on the previous two instruments?** |
| Mario Dire: | It's the same block and lot. **It's the same property** … The seller was listed as Robert J. Fileccia … The purchaser is indicated as 1276 Castleton Realty Company, LLC. |
| ADA Bousquet: | And on the deed itself, is there an amount of the sales price? … |
| Mario Dire: | For a transfer tax of one thousand one hundred and sixty dollars, [working backwards] the purchase price would have been approximately two hundred and ninety thousand dollars [$290,000] … |
| ADA Bousquet: | With respect to People's 1, does that document have information about the transfer tax? |
| Mario Dire: | Yes. It indicates that $260 in transfer tax was received by the County Clerk's office. |
| ADA Bousquet: | From that can you calculate what the purchase price was? |
| Mario Dire: | Yes. Based on the transfer tax rate, transfer tax in the amount of $260 would have resulted in a consideration of $65,000, approximately. |
| ADA Bousquet: | Okay. No further questions. |

344.  Defendant Dire withheld material and relevant exculpatory evidence from the jury and knowingly deceived them when he said the third deed "[is] the same property" as on the previous two instruments. He never once mentioned to the jury that the third deed had a new commercial building erected upon it.

345.    Defendant Dire, the First Deputy County Clerk of Staten Island, knows the difference between the sale of vacant land and the sale of a two story professional office building. He physically inspected three deeds, the first two of which clearly state, "VACANT LAND." The third does not.

346.    Defendant Dire knowingly and intentionally conspired and acted in concert with ADA Frey, ADA Varriale, and ADA Bousquet to conceal the cost and existence of the commercial building erected at 1276 Castleton Avenue to maintain the Plaintiff's malicious prosecution in violation of the Plaintiff's Fourth and Fourteenth Amendment constitutional right <u>not</u> to be maliciously prosecuted; and Sixth Amendment constitutional right to a fair trial.

**K.** NYPD Detective Georgette Romagnano Testified Falsely Before the Grand Jury to Initiate and Instigate the Plaintiff's Seizure and Continuing Seizure (Malicious Prosecution)

347.    Detective Georgette Romagnano is a complaining witness, who knowingly and intentionally committed perjury before the grand jury and withheld material and relevant exculpatory evidence to initiate the Plaintiff's wrongful seizure and continuing seizure in violation of the Plaintiff's Fourth Amendment constitutional rights.

348.    Defendant Detective Romagnano conspired and acted in concert with Defendants ADA Frey, ADA Varriale, Schenk, Tessiello, Arena, Moses, Cutaia, and Stahl to deceive the Grand Jury into believing that she had obtained and executed a valid search warrant of the Plaintiff's residence and home office at 496 Willowbrook Road in Staten Island. Otherwise, if the grand jury knew the truth—that there was a warrantless break-in and armed robbery of the Plaintiff's home—they would have questioned the veracity of the

allegations and the alleged probable cause for the warrant and grand jury investigation.

349.    Pursuant to the Fourth Amendment of the United States Constitution, Detective Romagnano's warrantless search and seizure precluded the arrest and prosecution of the Plaintiff as a matter of law. By concealing the March 19, 2002 warrantless search and seizure, Defendant Romagnano caused the grand jury to circumnavigate the constitutional impediment and thereby initiated the Plaintiff's false arrest, false imprisonment, and malicious prosecution without probable cause, reasonable cause or arguable probable cause to believe the Plaintiff guilty of any crime.

### L. Lori Orlando Fabricated Evidence to Initiate and Instigate the Plaintiff's Wrongful Seizure and Malicious Prosecution

350.    Defendant Lori Orlando fabricated Grand Jury Exhibit 34 as a ruse to help ADA Varriale circumnavigate the March 19, 2002 warrantless search and seizure of the Plaintiff's home. Since the Fourth Amendment of the United States Constitution requires suppression of The Stolen Fileccia Records, which contain the real estate closing documents pertaining to the sale of the Plaintiff's building to Steven and Lori Orlando, prosecutors needed a secondary source of evidence to bypass the exclusionary rule.

351.    Defendant Lori Orlando prepared a cover letter dated January 30, 2003, Bates-stamped 000113, addressed to ADA Frey that lists the real estate closing documents ADA Varriale needed to frame the Plaintiff. The January 30, 2003 letter states in pertinent part, "Enclosed please find copies requested by Michael Schenk ... Contract of Sale, Contract of Extras, All checks payable to Robert Fileccia (front and back) ... If you need any other copies please call our office at 718-448-0807."

352.    The problem is that prosecutors already had two complete copies of the Orlando real

estate closing file:

    a) First, ADA Frey obtained a complete copy of the Plaintiff's real estate closing file during the warrantless break-in and armed robbery of my home on March 19, 2002, Bates-stamped 500314-500453;

    b) Second, the Orlando's real estate lawyer, Allyn Crawford, Esq., sent ADA Frey his entire original closing file on March 6, 2002. See GX 33, Bates-stamped 001757-002131; and

    c) Third, Lori Orlando authorized Allyn Crawford to send ADA Frey the closing documents. In a letter dated March 6, 2002, Allyn Crawford told ADA Frey, "Enclosed please find a copy of our entire original closing file in regard to the purchase of 1276 Castleton Avenue by 1276 Castleton Realty Co., LLC. By copy of this letter to our client, I am confirming their consent that I deliver same to you."

353.   ADA Frey did not need a third copy of the exact same real estate closing documents. Lori Orlando was unlawfully masquerading as ADA Frey's fictitious alternative source of evidence to circumnavigate the exclusionary rule.

354.   As a result of this and other evidence, Defendants ADA Varriale, ADA Frey, Schenk, Lori Orlando, and Data Comm Consulting Group Inc. conspired and acted in concert to circumnavigate the exclusionary rule and to cause and procure the Plaintiff's unlawful seizure and malicious continuing seizure in violation of the Plaintiff's Fourth Amendment constitutional right against unwarranted searches and seizures and constitutional right not to be maliciously prosecuted.

355.   Defendant Lori Orlando was a willing participant to the acts and omissions described

herein.

### M. ADA Karen Varriale Fabricated Evidence to Initiate and Instigate the Plaintiff's Wrongful Seizure and Malicious Prosecution

356. Investigations reveal that ADA Karen Varriale joined ADA Frey's criminal conspiracy with the DOF auditors Schenk, Tessiello, Arena, Moses, Cutaia, and Stahl and took part in the manufacturing of false evidence against the plaintiff during the plotting (investigatory) stage of the proceedings.

357. In a recorded telephone conversation on January 24, 2007, Schenk admitted that he has been working with <u>both</u> ADA Frey and ADA Varriale since the onset of his engagement in August 2002, long *before* any presentation to a grand jury.

| | |
|---|---|
| Robert Fileccia: | Umm, did … did the District Attorney's Office contact you, your division, and have you do this investigation. |
| Michael Schenk: | Umm, yes. We were called – we were called in by the District Attorney. |
| Robert Fileccia: | Okay. And who was that, Mario Mattei?  Because that's my understanding it was Mario Mattei. |
| Michael Schenk: | I don't know. |
| Robert Fileccia: | Oh, okay. |
| Michael Schenk: | I couldn't say. |
| Robert Fileccia: | Who did you deal with primarily from the onset because then I'll talk to – is it just Karen Varriale or David Frey? |
| Michael Schenk: | **Well, actually both.** |
| Robert Fileccia: | Oh, both. |
| Michael Schenk: | **I mean, that's who I've dealt with.** |
| Robert Fileccia: | Right. And the initial person who started the tax case was David Frey from what I understand. … |
| Michael Schenk: | Yes, I believe so. |

358. Defendant ADA Varriale supervised and gave legal advice and instruction to the DOF

auditors in acquiring evidence and was <u>not</u> acting in her advocacy capacity. She acted in an investigatory capacity during the fabrication of the Plaintiff's fraudulent indictment.

359. ADA Varriale conspired and acted in concert with ADA Frey and the DOF auditors to frame the Plaintiff during the investigatory stage of the criminal proceeding without probable or reasonable cause to believe the Plaintiff guilty of any crime.

360. ADA Varriale caused and procured the Plaintiff's wrongful seizure and malicious continuing seizure in violation of my Fourth Amendment constitutional right against unwarranted searches and seizures and my constitutional right not to be maliciously prosecuted.

### 10. ADA VARRIALE, ADA MATTEI, AND THE DOF AUDITORS CONSPIRE TO CONSTRUCTIVELY AMEND THE TAX INDICTMENT

361. On January 3, 2007, the Plaintiff filed a meritorious motion to dismiss the Tax Indictment based upon "the prosecutors' willful violation of the [Plaintiff's] constitutional rights under color of law." I hereby incorporate the January 3, 2007 motion by reference into this complaint.

362. The Plaintiff's civil rights violation motion provided ADA Varriale with a complete copy of hundreds of invoices the Plaintiff paid for materials and licensed trades for the construction and renovation of my commercial building, notwithstanding the fact that she already had the same exculpatory evidence twice before; (a) from the warrantless search and seizure of the Plaintiff's home and (b) during prior motion practice.

363. The Plaintiff eviscerated the prosecution's fraudulent tax evasion theory, cornered ADA Varriale, and cut off her means of escaping civil and criminal liability for her ongoing civil rights crimes.

364.  In response, Defendants ADA Varriale, her supervisor ADA Mario Mattei, and the DOF auditors Schenk, Tessiello, Arena, Moses, Cutaia, and Stahl conspired and acted in concert to constructively amend the Tax Indictment in violation of the Plaintiff's Fourth, Fifth, Sixth, and Fourteenth Amendment constitutional rights.

365.  Defendants Schenk, Tessiello, Arena, Moses, Cutaia, and Stahl fabricated a second fraudulent tax evasion theory that can only be described as an internally flawed, meritless, never before criminalized, depreciation recapture theory.

366.  On or about January 12, 2007, ADA Varriale faxed and mailed me a falsified "Consent to Field Audit Adjustment" with fraudulent supporting worksheets that the DOF auditors concocted.  By mailing and faxing the falsified documents to me, ADA Varriale knowingly violated the Federal mail fraud and wire fraud statutes.

367.  In a recorded conversations on January 19, 2007, Schenk confessed that the Plaintiff did in fact incur a <u>loss</u> from the sale and renovation of my commercial building, but explained that since I "could have" deducted depreciation on my last eleven tax returns— but didn't—Schenk was penalizing me for not taking advantage of the tax benefits of the admittedly archaic law.  Schenk said he was adding back all the depreciation I "could have" deducted into my taxable income, and assessed a fraudulent tax liability of $7448 for the year 2001.

368.  On January 29, 2007, in open Court, the Plaintiff's co-counsel, Gary G. Becker Esq., informed Judge Steven Rooney of ADA Varriale's corrupt intention to constructively amend the indictment.  Plaintiff respectfully incorporates by reference the January 29, 2007 transcript into this complaint.

369.  In response, ADA Varriale contemptuously lied to the Court and said "We're not

proceeding under that theory." However, on February 1, 2007, ADA Varriale made the following statements to the trial jury proving that she was in fact going to constructively amend the indictment to maintain the Plaintiff's malicious prosecution in violation of my Fourth, Fifth, Sixth, and Fourteenth Amendment constitutional rights:

ADA Varriale:    Good afternoon, everyone. I'm Karen Varriale and I'm here along with Michael Bousquet and we are presenting this case to you. During the course of the trial we are going to – there will be some terms that come up. It's a tax case. You've all heard that. **We are going to use terms like depreciation** and basis. [Tr. 2/1/07 at 127.]

370.    Throughout the pretrial and trial proceedings, ADA Varriale's supervisor, ADA Mario Mattei, made repeated appearances to supervise and instruct his young associate. ADA Mattei was present in the Courtroom when ADA Varriale's corrupt intention to constructively amend the indictment was uncovered, and Mattei did nothing to stop her from pursuing the Plaintiff's malicious prosecution in violation of the my Fourth Amendment constitutional right to be free of unwarranted seizures and right not to be maliciously prosecuted.

## 11. MUNICIPAL LIABILITY
## MONELL V. DEP'T OF SOCIAL SERVS., 436 U.S. 658 (1977)

371.    Defendant DA Donovan is being sued in his official capacity as a manager of the Richmond County District Attorney's Office and policymaker for the City of New York.

372.    DA Donovan's signature at the end of Indictment 23/2004 is prima facie evidence that he reviewed the foregoing complaining witnesses' perjured testimony and fabricated evidence, and approved and ratified his subordinates unconstitutional acts and omissions with deliberate indifference for my constitutional rights.

373.    As a manager of the Staten Island District Attorney's Office, DA Donovan consciously

chose to ignore his subordinates' unconstitutional acts and omissions and intentionally failed to remedy them.

374. The Plaintiff sent DA Donovan at least thirty five (35) different letters by certified mail, federal express, or hand delivered them to his office, which informed him of the unconstitutional acts and omissions of his prosecutors and law enforcement personnel.

375. The letters were written to DA Donovan, Judge Leonard Rienzi, or his Assistant District Attorneys, with copies to the other parties and Supreme Court file. I respectfully incorporate by reference the following correspondence that are part of the official Court file in Indictment 23/2004:

   a) 1/2/04: Plaintiff to ADA Frey, cc DA Donovan;

   b) 1/5/04: Plaintiff to DA Donovan;

   c) 1/8/04: Plaintiff to Judge Rienzi, cc DA Donovan;

   d) 5/19/04: Plaintiff to DA Donovan;

   e) 6/2/04: Plaintiff to DA Donovan;

   f) 6/22/04: Plaintiff to Judge Rienzi, cc DA Donovan;

   g) 6/22/04: Plaintiff to Judge Rienzi and Judge Minardo, cc DA Donovan;

   h) 7/13/04: Plaintiff to DA Donovan;

   i) 7/14/04: Plaintiff to Judge Rienzi, cc DA Donovan;

   j) 8/2/04: Plaintiff to ADA Frey, cc DA Donovan;

   k) 8/3/04: ADA Frey to Plaintiff, cc DA Donovan;

   l) 8/13/04: Plaintiff to Judge Rienzi, cc DA Donovan;

   m) 8/23/04: Plaintiff to ADA Frey, cc DA Donovan;

   n) 8/31/04: Plaintiff to Judge Rienzi, cc DA Donovan;

   o) 9/8/04: Plaintiff to Judge Rienzi, cc DA Donovan;

   p) 9/22/04: Plaintiff to Judge Rienzi, cc DA Donovan;

   q) 9/22/04: Plaintiff to Judge Rienzi, cc DA Donovan;

   r) 9/28/04: Plaintiff to Judge Rienzi, cc DA Donovan;

   s) 10/18/04: Plaintiff to Judge Rienzi, cc DA Donovan;

   t) 10/29/04: Plaintiff to ADA McGee, cc DA Donovan;

u)  1/6/05: Plaintiff to Judge Rienzi, cc DA Donovan;

v)  1/17/05: Plaintiff to ADA Frey, cc DA Donovan;

w)  1/18/05: ADA Frey to Plaintiff, cc DA Donovan;

x)  5/18/05: Judge Rienzi to ADA Mattei, cc DA Donovan;

y)  6/2/05: Plaintiff to Judge Rienzi, cc DA Donovan;

z)  6/6/05: Plaintiff to DA Donovan;

aa) 6/6/05: Plaintiff to Judge Rienzi, cc DA Donovan;

bb) 6/23/05: Benjamin Brafman, Esq. to DA Donovan;

cc) 7/5/05: DA Donovan to Benjamin Brafman, Esq., cc Plaintiff;

dd) 7/11/05: Plaintiff to Judge Rienzi, cc DA Donovan;

ee) 7/21/05: ADA Frey to Judge Rienzi, cc DA Donovan;

ff) 8/15/05: Plaintiff to Judge Rienzi, cc DA Donovan;

gg) 12/19/05: Plaintiff to Judge Rienzi, cc DA Donovan;

hh) 12/21/05: Plaintiff to Judge Rienzi, cc DA Donovan;

ii) 3/10/06: Plaintiff to ADA Mattei, cc DA Donovan.

376.  For example,

a)  Plaintiff's January 17, 2005 certified mail letter to ADA Frey with copy to DA Donovan informed The City policymaker that ADA Frey was stealing United States Mail addressed to Robert Fileccia and rerouting it to the District Attorney's Office. DA Donovan consciously ignored ADA Frey's criminal activity and unconstitutional conduct with deliberate indifference for my constitutional rights;

b)  Plaintiff's December 19, 2005 certified mail letter to Judge Rienzi with copy to DA Donovan informed The City policymaker that ADA Frey was using the United States Postal Service as a Scheme to defraud the Plaintiff during motion practice in violation of 18 USCA §1341. The Plaintiff's letter states in pertinent part:

"Dear Justice Rienzi,

95

Earlier today, I received a 3-page affirmation dated December 14, 2005 signed by Assistant DA Karen Varriale which was mailed to me on December 16, 2005.  The People's answer, however, is believed to be 27 pages long, which was neither faxed nor mailed to me.  The People's manila envelope is post marked December 16, 2005 with sixty (60) cents postage.



United States Post Office Officials have confirmed that Karen Varriale's 3-page affirmation and 11½ x 14½ manila envelope weigh 1.51 ounces and costs exactly sixty (60) cents to mail.  Seven pages weigh 2.21 ounces and costs 83 cents to mail, 13 pages weigh 3.10 ounces and costs $1.06 to mail, 19 pages weigh 4.10 ounces and costs $1.29 to mail, and 27 pages weigh 5.41 ounces and costs $1.52 to mail. [US Post Office Triner Scale Model TS-30.] **Therefore, the People did not mail me the entire answer and used the United States Post Office to perpetrate a fraud in these proceedings.**  Furthermore, the return address on the manila envelope clearly states "ADA Frey" even though Karen Varriale ostensibly prepared the affirmation.



Respectfully submitted,

Robert J. Fileccia"

377.   The Plaintiff's other letters informed DA Donovan of, *inter alia*, his prosecutor's ongoing *Brady* violations, destruction of exculpatory evidence, fabrication of evidence, and malicious prosecution of the Plaintiff.

378.   DA Donovan failed to act or respond to all of the Plaintiff's letters and repeated complaints of civil rights violations evidencing a seared conscience and deliberate indifference for my constitutional rights.  DA Donovan turned a blind eye to his officer's habitual criminal and unconstitutional acts and omissions.

379.   In addition to the foregoing thirty five letters, on January 31, 2007, the Plaintiff sued DA Donovan during my tax trial for a writ of prohibition and mandamus pursuant to CPLR Article 78.   Hon. Fred T. Santucci of the Appellate Division Second Department signed an Order to Show Cause, Ordering DA Donovan and Staten Island Supreme Court Judge Robert Collini to show cause why the Plaintiff should not be entitled to the appointment of conflict free 18b counsel and the assistance of expert tax advice pursuant to New York County Law 722-c.   DA Donovan consciously chose to ignore the Order to Show Cause and his ADAs unconstitutional acts and omissions with deliberate indifference for the Plaintiff's constitutional rights.  DA Donovan answered the law suit <u>after</u> the Plaintiff's fraudulent tax indictment was dismissed.  His failure to timely respond is evidence that he approved, ratified and encouraged his subordinates unconstitutional acts and omissions.

12. THE  CITY,  BY  AND  THROUGH  ITS  POLICYMAKER  DA DONOVAN, ADOPTED AN UNCONSTITUTIONAL POLICY AND CUSTOM

380.    In a letter dated July 5, 2005, DA Donovan informed the Plaintiff of his personal policy and custom  not to intervene or otherwise discuss any aspect of an ongoing criminal case with defense counsel regardless of the unconstitutional acts or omissions of his assistants or law enforcement personnel.  DA Donovan's letter states in pertinent part,

> **"Since taking office on January 1, 2004, I have made it a policy not to speak personally to defense counsel regarding pending cases. I am familiar with the above said cases and see no reason to deviate from my policy in this instance."**

381.    DA Donovan's July 5, 2005 letter is prima facie evidence of an unconstitutional policy and custom that he adopted, and knew – with reasonable certainty – would result in anguish for innocent United States Citizens and significant violations of their constitutional rights.

382.    The City, by and through its policymaker DA Donovan, evinced deliberate indifference for the Plaintiff's constitutional rights throughout the criminal proceedings and thereafter.

383.    The City's unconstitutional policies and customs were (a) deliberately or recklessly indifferent to the Plaintiff's constitutional rights; and (b) deliberately or recklessly indifferent to the issue of whether innocent people were being convicted of crimes.

384.    The City's municipal liability here is premised upon, among other things, their failure to adopt proper and reasonable policies and practices in the face of an obvious need to do so.

385.    DA Donovan's conduct operated, *inter alia*, to deprive Plaintiff of important and well established constitutional rights including my Fourth Amendment right against unwarranted searches and seizures; right to be free from a malicious prosecution; right to a fair trial; and right to freedom from the deprivation of liberty without due process of

law.

### 13. THE CITY, BY AND THROUGH ITS POLICYMAKER DA DONOVAN, FAILED TO ADEQUATELY TRAIN AND SUPERVISE HIS ASSISTANT DISTRICT ATTORNEYS, EMPLOYEES, AND LAW ENFORCEMENT PERSONNEL

386. The City, by and through its policymaker DA Donovan, was grossly negligent in managing and supervising his assistant district attorneys, employees (including Paralegal Watts), and law enforcement personnel—including but not limited to police officers, detectives and DOF auditors—who caused and procured the Plaintiff's unlawful seizure and malicious prosecution without reasonable or probable cause that I was guilty of any crime.

387. The City, by and through its policymaker DA Donovan, failed to adequately train and supervise the assistant district attorneys, employees, and law enforcement personnel relating to:

    a) their obligation to refrain from fabricating evidence;

    b) their obligation to avoid the use of fabricated evidence;

    c) their obligation to disclose Brady material;

    d) their obligation to avoid the use of perjured testimony;

    e) their obligation to refrain from suborning perjury;

    f) their obligation to disclose exculpatory evidence;

    g) their obligation to disclose Rosario material;

    h) their obligation to refrain from constructively amending indictments;

    i) their obligation to avoid framing innocent US citizens;

    j) their obligation to avoid accepting bribes or other form of compensation in return

for convicting innocent US citizens;

388. The City, by and through its policymaker DA Donovan, knew to a moral certainty that his ADAs, employees, and law enforcement personnel would confront the particular situations described in (a) through (j) above.

389. The City, by and through its policymaker DA Donovan knew the situations described in (a) through (j) above presents the ADAs, employees, and law enforcement personnel with a difficult choice of the sort that training or supervision would make less difficult or that there is a history of employees mishandling the situation.

390. The City, by and through its policymaker DA Donovan, knew that the wrong choice by the ADAs, employees, and law enforcement personnel frequently causes constitutional deprivations.

### 14. THE CITY, BY AND THROUGH ITS POLICYMAKER COMMISSIONER RAYMOND KELLY, FAILED TO ADEQUATELY TRAIN AND SUPERVISE HIS POLICE OFFICERS

391. The City, by and through its policymaker Police Commission Raymond Kelly, was grossly negligent in managing and supervising Detective Georgette Romagnano and other police officers who accompanied her during the warrantless search and seizure of the Plaintiff's residence and home office, who caused and procured the Plaintiff's unlawful seizure and malicious prosecution without reasonable or probable cause that I was guilty of any crime.

392. The City, by and through its policymaker Kelly, failed to adequately train and supervise his police officers relating to:

  a) their obligation to refrain from obtaining search warrants and arrest warrants without probable cause, reasonable cause, or arguable probable cause;

b) their obligation to refrain from executing and conducting warrantless searches and seizures;

c) their obligation to refrain from executing and conducting warrantless searches and seizures without a valid search warrant signed by an impartial magistrate;

d) their obligation to refrain from fabricating evidence;

e) their obligation to avoid the use of fabricated evidence;

f) their obligation to refrain from committing perjury;

g) their obligation to avoid the use of perjured testimony;

h) their obligation to disclose exculpatory evidence;

i) their obligation to disclose Brady material;

j) their obligation to disclose Rosario material;

k) their obligation to avoid framing innocent US citizens;

l) their obligation to avoid accepting bribes or other form of compensation in return for convicting innocent US citizens.

393. The City, by and through its policymaker Kelly, knew to a moral certainty that his police officers would confront the particular situations described in (a) through (l) above.

394. The City, by and through its policymaker Kelly, knew the situations described in (a) through (l) above presents the police officers with a difficult choice of the sort that training or supervision would make less difficult or that there is a history of employees mishandling the situation.

395. The City, by and through its policymaker Kelly, knew that the wrong choice by the police officers frequently causes constitutional deprivations.

15. THE CITY, BY AND THROUGH ITS POLICYMAKERS DOF

### COMMISSIONERS MARTHA STARK AND DAVID M. FRANKEL, FAILED TO ADEQUATELY TRAIN AND SUPERVISE THEIR AUDITORS AND EMPLOYEES

396. The City, by and through its policymakers DOF Commissioners Martha Stark and David M. Frankel, was grossly negligent in managing and supervising their DOF auditors and employees—Schenk, Tessiello, Arena, Moses, Cutaia, Stahl, and Kokeas—who caused and procured the Plaintiff's unlawful seizure and malicious prosecution without reasonable or probable cause that I was guilty of any crime.

397. The City, by and through its policymakers DOF Commissioners Martha Stark and David M. Frankel, was grossly negligent in managing and supervising DOF lawyer David Atik, Esq. who knowingly violated the Plaintiff's constitutional right of access to the courts.

398. The City, by and through its policymakers DOF Commissioners Martha Stark and David M. Frankel, failed to adequately train and supervise Atik relating to:

    a) his obligation to timely provide documents to taxpayers pursuant to FOIL;

    b) his obligation not to obstruct justice or commit misprision of felony;

    c) his obligation to refrain from destroying taxpayer FOIL documents;

    d) their obligation to avoid accepting bribes or other form of compensation in return for favors.

399. The City, by and through its policymakers DOF Commissioners Martha Stark and David M. Frankel, knew to a moral certainty that Atik would confront the particular situations described in (a) through (d) above.

400. The City, by and through its policymakers DOF Commissioners Martha Stark and David M. Frankel knew the situations described in (a) through (d) above presents Atik with a difficult choice of the sort that training or supervision would make less difficult or that

there is a history of employees mishandling the situation.

401.   The City, by and through its policymakers DOF Commissioners Martha Stark and David M. Frankel knew that the wrong choice by Atik frequently causes constitutional deprivations.

### 16. THE CITY, BY AND THROUGH ITS POLICYMAKERS DOF COMMISSIONERS MARTHA STARK AND DAVID M. FRANKEL, ADOPTED AN UNCONSTITUTIONAL POLICY AND CUSTOM

402.   In a recorded conversation on January 24, 2007, Schenk claimed that the DOF Commissioner promulgated a "policy" whereby he and his auditors were trained and instructed not to consider any evidence older than "usually three years", whether or not the evidence is exculpatory or vindicates the accused. When asked whether his 3 year look back period was a law or policy, Schenk responded, "No. It's the policy that's promulgated by the Commissioner." [Tr. 1/24/07 at 37.]

403.   Therefore, based upon this and other evidence, The City, by and through its Policymakers DOF Commissioner Martha Stark and David Frankel, adopted an unconstitutional policy and custom, and knew with reasonably certainty would result in violation of the Plaintiff's constitutional rights.

404.   The City's unconstitutional customs, decisions, policies and or indifferent employee training or supervision were (a) deliberately or recklessly indifferent to a criminal defendant's constitutional rights; and (b) deliberately or recklessly indifferent to the issue of whether innocent people were being convicted of crimes.

405.   The City's municipal liability here is premised upon, among other things, their failure to adopt proper and reasonable policies and practices in the face of an obvious need to do so.

406. The aforesaid conduct operated, *inter alia*, to deprive Plaintiff of important and well established constitutional rights including my Fourth Amendment right against unwarranted searches and seizures; right to be free from a malicious prosecution; right to a fair trial; and right to freedom from the deprivation of liberty without due process of law.

### 17. THE CITY, BY AND THROUGH ITS POLICYMAKER COMMISSIONER STEPHEN J. FIALA, FAILED TO ADEQUATELY TRAIN AND SUPERVISE HIS DEPUTY COUNTY CLERK

407. The City, by and through its policymaker Commissioner Stephen J. Fiala, was grossly negligent in managing and supervising Deputy County Clerk Mario Dire who caused and procured the Plaintiff's unlawful seizure and continuing malicious seizure without reasonable or probable cause that I was guilty of any crime.

408. The City, by and through its policymaker Commissioners Stephen J. Fiala, failed to adequately train and supervise Dire relating to:

   a) his obligation to refrain from fabricating evidence;

   b) his obligation to refrain from committing perjury;

   c) his obligation to refrain from withholding exculpatory evidence;

   d) his obligation to refrain from making misleading statements to a grand jury or trial jury;

   e) his obligation to disclose exculpatory evidence;

   f) his obligation to avoid the use of fabricated evidence;

   g) his obligation to avoid framing innocent US citizens;

   h) his obligation to avoid accepting bribes or other form of compensation in return for convicting innocent US citizens.

409.   The City, by and through its policymaker Commissioner Stephen J. Fiala, knew to a moral certainty that Dire would confront the particular situations described in (a) through (h) above.

410.   The City, by and through its policymaker Commissioner Stephen J. Fiala, knew the situations described in (a) through (h) above presented Dire with a difficult choice of the sort that training or supervision would make less difficult or that there is a history of employees mishandling the situation.

411.   The City, by and through its policymaker Commissioner Stephen J. Fiala, knew that the wrong choice by Dire frequently causes constitutional deprivations.

### 18. THE CITY, BY AND THROUGH ITS POLICYMAKER NYC COMPTROLLER WILLIAM THOMPSON, FAILED TO ADEQUATELY TRAIN AND SUPERVISE HIS EMPLOYEES

412.   The City, by and through its policymaker NYC Comptroller William Thompson, was grossly negligent in managing and supervising his claim examiners and employees— Aaronson, Howe, Bryant, and Samuel—who violated the Plaintiff's constitutional right of access to the courts.

413.   The City, by and through its policymaker NYC Comptroller William Thompson, failed to adequately train and supervise his claim examiners and employees relating to:

    a)  their obligation to refrain from issuing ghost claim numbers;

    b)  their obligation to refrain from obstructing a plaintiff's right of access to the courts;

    c)  their obligation to refrain from disallowing a claim without reasonable cause;

    d)  their obligation to refrain from purposely delaying a claim;

    e)  their obligation to refrain from accepting bribes or other form of compensation in

return obstructing the Plaintiff's meritorious State claims;

    f) their obligation to responsibly settle legitimate claims against The City.

414.    The City, by and through its policymaker NYC Comptroller William Thompson, knew to a moral certainty that his claim examiners and employees would confront the particular situations described in (a) through (f) above.

415.    The City, by and through its policymaker NYC Comptroller William Thompson, knew the situations described in (a) through (f) above presents his claim examiners and employees with a difficult choice of the sort that training or supervision would make less difficult or that there is a history of employees mishandling the situation.

416.    The City, by and through its policymaker NYC Comptroller William Thompson, knew that the wrong choice by the claim examiners and employees frequently causes constitutional deprivations.

## 19. THE PLUMBERS TEAM
## CONTAINMENT BY THE USE OF ANY MEANS NECESSARY

417.    This section is designed to inform the Federal District Court of disturbing events, facts and circumstances **leading up to** the dismissal of the Plaintiff's Tax Indictment, which was in favor of the accused. The Second Circuit has ruled that an "[a]nswer to whether termination of underlying criminal proceedings is indicative of innocence, for purposes of subsequent malicious prosecution action under New York law, depends on nature and circumstances of termination. If, however, there is question as to nature of circumstances **leading to that termination,** that question is one for trier of fact." [Emphasis supplied.] Murphy v. Lynn, 118 F.3d 938. Therefore, the following facts and circumstances are mandatory.

418.    This section is <u>not</u> intended to disparage the State Supreme Court or any other authority. However, the truth in this case has been chased from courtroom to courtroom, not by any great legal act on the part of prosecutors I might add, but by the Judiciary. Therefore, it would be cowardly for me not to express my deepest concerns and fears for innocent United States citizens who may find themselves hauled into Court before the below named magistrates that the record evidence will show regard the United States Constitution as a troublesome annoying document that can be played with like a child's doll.

419.    The Federal District Court may recall that "the Plumbers" were a covert White House Special Investigations Unit established during the Presidency of Richard Nixon. Its task was to stop the leaking of classified information to the news media. Webster's Online Dictionary defines a plumber as "a person whose job is to prevent or put an end to leaks of sensitive information."

420.    During the criminal proceedings in this case, three State Supreme Court Judges repeatedly denied the Plaintiff's meritorious motions that were supported by overwhelming admissible factual evidence of the prosecutors' criminal activity including ADA Frey's theft of the Plaintiff's mail. They denied or would not consider <u>all</u> of the Plaintiff's motions including (a) 2-page warrantless search and seizure suppression motion; (b) motions to dismiss the tax indictment based upon irrefutable documentary evidence including hundreds of paid invoices proving the Plaintiff sustained a loss on the sale of my commercial building; (c) motions to unseal the original expired search warrant; (d) 6th Amendment motions to dismiss the tax indictment based upon the prosecutors intentional failure to provide the Plaintiff with the nature and cause of the

accusations against me; (e) motions for the appointment of a special prosecutor; (f) motions for exculpatory evidence; (g) motions for *Brady* material; (h) motions for *Rosario* material; (i) motions to dismiss because of the prosecutors' destruction of exculpatory evidence; (j) motions to enforce the Court's discovery Orders (that were illusory); among many others.

421.    As the evidence mounted against prosecutors, their responses became increasingly muted.

422.    On some occasions, prosecutors did not oppose the Plaintiff's motions, the judges did. See Tr. 5/11/06 at 1-23.

423.    On other occasions, the Judges misused motion practice for intelligence gathering purposes. See J. Rienzi 1/6/06 decision "extending [Plaintiff's] time to file all motions until January 20, 2006" inviting "the promised Franks-Alfinito motion." [Emphasis in the original.]    Compare to J. Rienzi 5/8/06 decision where the Court argues its own arguments in opposition to the Plaintiff's 100-page Franks motion and refused to even consider the Plaintiff's 2-page unopposed warrantless search and seizure motion as being purportedly "untimely", notwithstanding his clear and unambiguous invitation to file all motions by January 20, 2006.

424.    And on still other occasions, the Judges and prosecutors would talk to one another in code or with flash messages. See Tr. 6/14/04 at 21, where ADA Frey sent J. Rienzi an unsolicited warning in open court, entirely unrelated to the proceedings, that the Plaintiff just purchased the prosecutor's fabricated arrest evidence;

> "Judge, on a side note, there have been issues about the Corvette. They wanted access again and again to the Corvette. I've been informed that they purchased that Corvette for fifteen thousand dollars … they either have the car or they are about to get the car, but I want you to know."

425.    On January 29, 2007, the Plaintiff asked Judge Steven Rooney in open Court for the

appointment of a special prosecutor based upon newly discovered evidence of ADA Frey's ongoing mail crimes. Without ADA Frey saying a word, Judge Rooney buried the charges and said, "The DA is in no position to answer it now."

Robert Fileccia:   Your Honor, do you also direct me to make this same application which I'm about to make to you now, to Judge Collini? And the application is this, your Honor: Based upon newly discovered evidence, including eyewitnesses, it has been confirmed and verified that Assistant District Attorney David Frey and others have been stealing the defendant's United States mail for almost five years to cover up the District Attorney's attempted theft of approximately one million dollars of the Fileccia family's lifetime savings in the car indictment and to manufacture the tax indictment in retaliation for the defendants uncovering the District Attorney's criminal activity.

I'm accusing Assistant District Attorney David Frey of the Richmond County District Attorney's Office of having intentionally committed federal mail crimes including violation of 18 USCS 1701 obstruction of mail generally, 18 USCS 1702 obstruction of correspondence, 18 USCS 1708 theft or receipt of stolen mail generally, 18 USCS 1341 fraud and swindles. As a result, I must prepare and file a comprehensive motion for an appointment of a special prosecutor with federal oversight.

Your Honor will recall that on July 13, 2006, this Court granted the prosecutor's leave to file a motion for a special prosecutor which they never made. ...

Judge Rooney:      They withdrew it.

Gary G. Becker:    They didn't withdraw it. They never made it.

Judge Rooney:      Fine.

Robert Fileccia:   However, the prosecutors in this pending indictment, Ms. Varriale and David Frey have become fact witnesses and must be disqualified under the holding of People v. Paperno (ph), 54 New York 2nd 294. Your Honor, these prosecutors cannot try this case. I'm entitled to my due process right to have a special prosecutor appointed and for me to make – file a written motion for that appointment, your Honor. It has been confirmed by eyewitnesses and ear witnesses who are prepared to testify against the prosecutors.

Judge Rooney:      All right. Well, that wasn't in the papers you filed this morning.

The DA is in no position to answer it now.  [Tr. 1/29/07 at 17-19.]

426.    On January 30, 2007, Judge Robert Collini was equally dismissive of the Plaintiff's open court accusation that the United States Postal Service had implicated Judge Leonard Rienzi in having received illegal ex parte communications about ADA Frey's theft of my mail. Judge Collini condemned the Plaintiff's allegations as "an attempt to delay the trial."

| | |
|---|---|
| Judge Collini: | Now, lets move forward. |
| Robert Fileccia: | All right, Judge. I have two other newly discovered information that was not before your Honor, which is that I have received evidence that indicates Justice Leonard Rienzi has received ex parte communications from the United States Postal Service in reference to Assistant District Attorney David Frey's theft of the defendant's mail. The information is dated – well, it's my understanding that it was before June 22, 2005. |
| | The problem of constitutional dimension, your Honor, is that since Justice Rienzi rendered a decision shortly before that time, not entertaining a two page motion in reference to an expired search warrant and a warrantless search of 496 Willowbrook Road, your Honor, that is of constitutional dimension and we should investigate that because – |
| Judge Collini: | I'm going to stop you.  How old is this case? |
| Robert Fileccia: | This one here, the tax case? |
| Judge Collini: | This one we're trying. |
| Robert Fileccia: | Three years is my understanding. |
| Judge Collini: | And how many days is that? |
| Robert Fileccia: | I – |
| Judge Collini: | It's over a thousand days.  And in that thousand days, how much time have you had to investigate these allegations? |
| Robert Fileccia: | Your Honor, this is newly discovered evidence. |
| Judge Collini: | Counsel – |
| Robert Fileccia: | I'm an officer of this Court. I have to verify information before I come out and say such things on the record. And under the federal rules, I would have to evaluate all the evidence before I make such a statement, judge, so that I am not held in contempt. |
| Judge Collini: | I don't have any intention at this time of holding you in |

contempt.

Robert Fileccia:    But, Judge –

Judge Collini:    I'm going to stop you.

Robert Fileccia:    That's why it's so important.

Judge Collini:    I'm going to stop you.

Besides, I don't see anything before me but you saying something.

There are two things that I want you to at least address briefly. One, the relevance of whatever you're talking about to this indictment. That's number one.

Number two, beside your simple allegation, unsubstantiated allegation, what more is there for me to review?

Robert Fileccia:    Well ... I have concerns about releasing information about federal mail crimes to the parties, namely, to David Frey, who committed the crime. That may be an obstruction of justice. I'm an officer of the court, Judge.

Judge Collini:    I'm going to stop you.

Robert Fileccia:    You said you wanted the relevancy to this case.

Judge Collini:    Okay. You can go there too. It really doesn't matter if it's relevant or not if there nothing to substantiate what you're saying to me.

Robert Fileccia:    Your Honor, may I say the relevancy, which is terribly important?

Grand Jury Exhibit number 29 is a notice of deficiency purportedly mailed to me at my home saying that I owe the Department of Taxation, I believe it said, sixty thousand dollars.

Well, your Honor, I didn't receive that and that's Brady material. And if I didn't receive it and the District Attorney's Office stole it and destroyed it, so therefore, your Honor, it's relevant.

Judge Collini:    Stop ... every application from here on ... will be viewed as an attempt to delay the trial. [Tr. 1/30/07 at 33-36.]

427.    However, less than a week later, on February 6, 2007, Steven Orlando testified under oath to stealing the Plaintiff's mail and sending it to ADA Frey during his cross examination. Judge Collini stopped the cross examination, and abruptly threw the jury out of the courtroom, for them never to return again.

| Q: | Mr. Orlando, did you occupy the building throughout the calendar year 2004 and 2005? |
| Steven Orlando: | Datacomm, yes. |
| ADA Bousquet: | Objection. |
| Judge Collini: | Let's see where we are going.  Overruled. |
| **Q:** | **Do you, in connection with Datacomm, have an account with the Federal Express company?** |
| ADA Bousquet: | Objection. |
| **Steven Orlando:** | **I'm sure we do.** |
| Judge Collini: | Counsel, if there is something to this, let's get to it. |
| Q: | Yes, your Honor.  I'm trying to do it with a foundation properly. |
| Judge Collini: | Go ahead. |
| Q: | And in connection with your account with Fed-Ex, did they issue you pre-printed air bills? |
| Steven Orlando: | Yes. |
| Q: | And when you send something Fed-Ex, do you use those air bills? |
| Steven Orlando: | Yes … |
| Q: | And do you know an individual named David Frey? |
| ADA Bousquet: | Objection. |
| Judge Collini: | If you have a point to this, get to it … Get there quickly. |
| **Q:** | **Who is David Frey?** |
| **Steven Orlando:** | **He's an ADA.** |
| **Q:** | **How do you know him?** |
| **Steven Orlando:** | **From this case …** |
| Q: | And, by the way, he's an ADA in this office, the Richmond County District Attorney's Office, right? |
| Steven Orlando: | Yes. |
| Q: | And to your knowledge, he's been prosecuting one or both of the Fileccias? |
| ADA Bousquet: | Objection, judge. |
| Judge Collini: | Overruled. |
| Q: | Is that your understanding, sir? |
| Steven Orlando: | Yes. |
| **Q:** | **And have you been working with him assisting him in that prosecution?** |

| | |
|---|---|
| **Steven Orlando:** | **Well, what do you mean by assisting?** |
| **Q:** | **Well, have you been providing him with pieces of paper of any kind?** |
| **Steven Orlando:** | **Yes.** |
| **Q:** | **And would those pieces of paper include sealed envelopes?** |
| **Steven Orlando:** | **Yes.** |
| **Q:** | **And would those sealed envelopes include United States Postal Service mail?** |
| ADA Bousquet: | Objection. |
| Judge Collini: | Alright, ladies and gentlemen, you are going to step outside … Mr. Orlando, you can step out too. [Tr. 2/6/07 at 213-217.] |
| Judge Collini: | The Jury is out of the room. The witness is out of the room and the door is closed. Mr. Becker, what are we talking about? … |
| **Q:** | **I'm going to prove, if your Honor lets me, that this man is a thief. He has been stealing Mr. Fileccia's mail, the mail that would have given him notice of a civil tax audit. He has been stealing his mail and sending it to Assistant District Attorney David Frey.** |

428.   Knowing ADA Frey was in serious trouble, Judge Collini spent the balance of the afternoon and next morning:

    a)  Concealing and or downgrading ADA Frey's criminal activity;

    b)  Looking for a suitable exit strategy; and

    c)  Attempting to tie off the DA's black operation by undermining the Plaintiff's access to the Courts. See Tr. 2/6/07 213-240, including:

| | |
|---|---|
| Judge Collini: | And as far as the relevance, I'm not really sure how relevant it is, in any event. Even if it was something he was doing, **unless the suggestion is somehow he was working in cahoots with the District Attorney's Office to set Mr. Fileccia up –** |
| Gary Becker: | Does your Honor really believe that a citizen of the United States has the right to take – it's a felony. |
| Judge Collini; | Stop, stop. It's a felony if it's done willfully. |
| Gary Becker: | Ahhh, yes. |

| | |
|---|---|
| Judge Collini; | If it's not done willfully, it's not. |
| Gary Becker: | That's this whole case. |
| Judge Collini: | Counsel, I wasn't asking for you to make comment on this. … Maybe you should sit down.  [Tr. 2/6/07 at 233, 234.] |

***

| | |
|---|---|
| Judge Collini: | I know the implication is that he was doing something nefarious, and maybe in a different tribunal people will investigate as to whether or not something nefarious was done.  And if you say you have other evidence with respect to that, submit it to whoever you need to submit it to and maybe they'll think an investigation should occur, but that's not what we are doing here … |
| Gary Becker: | I guess these circumstances struck my outrage meter more than your Honor's. |
| Judge Collini: | It's not what I'm doing.  I'm doing this trial.  Maybe someday I'll do that trial and then we'll talk about it, but that's not what we are doing here. |
| **ADA Varriale:** | **I'm afraid we are going to get to the point where the witness is going to need to be advised of his Miranda warnings.** |
| Judge Collini: | Is there any debate as to the fact that he sent mail [to ADA Frey]? |
| ADA Varriale: | No, he sent it.  [Tr. 2/6/07 at 239.] |

429.  ADA Varriale warned Judge Collini that as a public prosecutor, she was afraid that she was going to have to soon read Steven Orlando his Miranda rights because his stealing the Plaintiff's mail was in fact willful.

## 21. JUDGE ROBERT COLLINI'S TORTURE TACTICS

430.  Judge Robert Collini employed numerous unconstitutional torture tactics in his failed attempt to coerce the pro se indigent Plaintiff into pleading guilty to a crime the record evidence clearly showed I did not commit.

431.  The following torture tactics are unconstitutional and customarily used only to break-down enemy combatants, not innocent United States citizens.

432.   In order to isolate the pro se indigent Plaintiff, Judge Collini

    a)   stripped the Plaintiff of my constitutional right to assigned counsel;

    b)   stripped the Plaintiff of my constitutional right to assigned tax experts; and

    c)   stripped the Plaintiff of my constitutional right to free daily transcripts, notwithstanding being certified to be a poor person on November 25, 2005 by Judge Leonard Rienzi. See Tr. 11/25/05 at 3, 4.

433.   In order to induce stress and intimidation, Judge Collini ordered at least three (3) armed court officers to surround the Plaintiff during trial although I was charged with one non-violent fabricated tax offense.

434.   In order to induce physical discomfort and vomiting, Judge Collini ordered Court officer's to confiscate the Plaintiff's bottled water after they brought the Plaintiff to an elevated state of nervousness.

435.   In order to induce fear, Judge Collini threatened the Plaintiff with "remanding" me to prison at the beginning of trial notwithstanding my being released on my own recognizance at the arraignment of the 1-count alleged tax offense.

436.   In order to induce sensory deprivation, Judge Collini ordered the Court clerk to shut off the microphone at the Plaintiff's trial table.

437.   In order to induce anxiety, Judge Collini lambasted the Plaintiff throughout the trial in a loud omnipotent tone.

438.   In order to induce a feeling of abandonment, Judge Collini ordered Court officers to segregate the Plaintiff's family members to the very back of the Courtroom, behind more than one hundred prospective jurors, Assistant District Attorneys, and court personnel.

439.   In order to induce physical illness, Judge Collini ordered the Plaintiff to put away

pneumonia medication that was sure to be overlooked during trial.

440.    In order to induce hopelessness, Judge Collini ordered the Plaintiff to hide a religious item (rosary) and blasphemed the Plaintiff's faith during trial.

441.    The foregoing torture tactics were intended to cause not just momentary suffering but lasting psychological harm throughout the trial and thereafter.

442.    In the end, Judge Robert Collini's mendacity was exposed in his own words. I respectfully incorporate by reference the entire trial transcript of Indictment 23/2004 into this complaint.

443.    Defendants ADA Varriale and ADA Bousquet evinced a deliberate indifference to the health and safety of the Plaintiff Robert Fileccia.

444.    Defendants ADA Varriale and ADA Bousquet approved, condoned, and ratified the foregoing unconstitutional torture tactics in violation of the Plaintiff's eighth amendment constitutional right against cruel and unusual punishment.

445.    The City, by and through its policymaker DA Donovan, was grossly negligent in managing and supervising ADA Varriale and ADA Bousquet.

446.    The City, by and through its policymaker DA Donovan, failed to adequately train and supervise ADA Varriale and ADA Bousquet relating to their obligation to refrain from approving or ratifying a Supreme Court Judges torture tactics in violation of an innocent United States citizen's constitutional rights.

447.    The City, by and through its policymaker DA Donovan, knew to a moral certainty that ADA Varriale and ADA Bousquet would confront the particular situation described herein: unconstitutional torture tactics.

448.    The City, by and through its policymaker DA Donovan knew the situation

(unconstitutional torture tactics) presents ADA Varriale and ADA Bousquet with a difficult choice of the sort that training or supervision would make less difficult or that there is a history of employees mishandling the situation.

449.    The City, by and through its policymaker DA Donovan, knew that the wrong choice by ADA Varriale and ADA Bousquet frequently causes constitutional deprivations.

## 22. JUDGE ROBERT COLLINI TAMPERED WITH JURORS

450.    Judge Collini surreptitiously tampered with jurors during the trial including but not limited to the following examples.

451.    At the onset of jury selection, Judge Collini intentionally demonized the Plaintiff to corrupt the jury pool. Without basis or provocation, Judge Collini instructed jurors that the Plaintiff "will be expected to conduct himself in the appropriate fashion … to speak only if it's his turn to speak and to use appropriate language … to be respectful to everyone in the Courtroom" and "should the Plaintiff seek to gain some advantage as a result of his self representation, I may be compelled, as I just was, to admonish him and to take corrective action." [Tr. 2/1/07 at 53, 54.]

452.    When confronted by the Plaintiff about the Court's unprovoked prejudicial jury instructions, Judge Collini agreed to give the jury a curative instruction that was eventually meaningless because of the Court's delay and mundane content. See Tr. 2/1/07 at 84-86, and 91-97.

453.    During the *voir dire* of the jury, Judge Collini also tampered with prospective jurors by asking them whether they ever had a car stolen. He did this knowing that the Plaintiff was falsely accused with grand larceny of automobiles in the 309-Count Car Indictment that was dismissed on February 27, 2007 in favor of the accused.

454.    Question number 10 (c) on the Juror Questionnaire form states: Have you or any member of your family "Ever been a victim of a crime."

455.    If a Juror said they were <u>not</u> the victim of a crime, Judge Collini would still ask them whether they ever had a car stolen.

456.    **Judge Collini asked thirteen (13) prospective jurors whether they ever had a car stolen attempting to corrupt the jury pool.**  <u>See</u> Tr. 2/1/07 at 99, 103, 118, 119, 120, 121, 126, 185, 188.  <u>See</u> also Tr. 2/5/07 at 321, 324, 326, 330.

457.    The following are two examples:

| | |
|---|---|
| Judge Collini: | Go to C.  Have you ever been the victim of a crime? |
| Prospective Juror: | No, I haven't. |
| Judge Collini: | Never had your car stolen? |
| Prospective Juror: | No.  [Tr. 2/1/07 at 120, 121.] |

***

| | |
|---|---|
| Judge Collini: | Have you ever been the victim of a crime? |
| Prospective Juror: | No. |
| Judge Collini: | Never had a car stolen or anything like that? |
| Prospective Juror: | No. |

458.    Defendants ADA Varriale and ADA Bousquet approved, condoned, and ratified the foregoing jury tampering in violation of the Plaintiff's Fourth, Fifth, Sixth, and Fourteen Amendment constitutional rights.

### 23. THE PLAINTIFF'S INDICTMENT WAS DISMISSED IN FAVOR OF THE ACCUSED.

459.    On February 7, 2007, trial resumed with Judge Collini looking for a reason to dismiss the Plaintiff's indictment other than the prosecutor's criminal activity and deliberate fabrication of evidence during the investigatory stage of the proceeding.

460.    On page 259-261 of the minutes, Judge Collini asked defense counsel, Gary Becker, Esq., whether the Plaintiff had evidence to prove that I erected a commercial building at 1276 Castleton Avenue. Becker's response, however, was not what Judge Collini had expected or hoped for:

| Judge Collini: | Mr. Becker, you told me that – you had indicated, I think, in your opening that you have evidence to show that there was money spent improving the property. |
| Gary Becker: | We do, and so did the People. It was given to them over a year ago. |
| **Judge Collini:** | **Well, after the Grand Jury presentation, once they had this –** |
| **Gary Becker:** | **They had it before when they searched Mr. Fileccia's residence and seized all his records.** |
| Judge Collini: | You want to come up? |
| Gary Becker: | Sure. ... |
| Judge Collini: | We had an extensive bench conference and you can correct me – either party can correct me if I'm wrong on this. At the bench conference we discussed the People's case, basically. |
| ADA Varriale: | Yes. ... |
| Gary Becker: | Everything your Honor just said was accurate. It doesn't at all come close to summarizing the content of everything we discussed. [Tr. 2/7/07 at 259-261.] |

461.    Judge Collini tried to pervert the record and falsely impart that prosecutors received the Plaintiff's construction receipts and invoices *after* the grand jury presentation.

462.    However, Gary Becker immediately corrected the record and made it crystal clear that prosecutors had obtained all of the exculpatory evidence—more than a thousand (1000) construction receipts and invoices—long *before* presentation to a grand jury. As a result, prosecutors lost their immunity and were personally liable for violating the Plaintiff's constitutional rights.

463.    Although Judge Collini proclaimed that "no part of these proceedings is going to be off

the record" and "there are no sidebars at this trial," he jumped off the record five more times immediately before dismissing the indictment.

464.   Eyewitness testimony reveals that during the third off-the-record bench conference, Judge Collini admonished ADA Varriale and expressed his intent to dismiss the indictment because of grand jury deception:

> Judge Collini:    The issue before this Court is not whether you deceived the grand jury; it's whether you acted intentionally.

465.   ADA Varriale was seen crying in the courtroom after this exchange with Judge Collini.

466.   During the last off-the-record conversation, Judge Collini attempted to bribe the Plaintiff by offering me a bench trial of a lesser included misdemeanor offense.  I refused the Court's disingenuous offer and demanded a jury trial. An active law enforcement officer witnessed the events.

> (Whereupon, an off the record discussion was held at the bench among the Court and counsel, after which the proceedings continued as follows:)
>
> **Judge Collini:    At this point, counsel, I want you to take however much time you need. Talk about what we talked about with your client. Make a decision on how you want to proceed.**
>
> Gary Becker:    Your Honor, could we approach again?
>
> Judge Collini:    Sure.
>
> (Whereupon, an off the record discussion was held at the bench among the Court and counsel, after which the proceedings continued as follows:)
>
> Judge Collini:    We'll take a recess until noon.  [Tr. 2/7/07 at 261, 262.]

467.   Judge Collini threatened the Plaintiff and defense counsel with criminal contempt if there were any tape recordings, notes or stenographic minutes being taken of the off-the-record conversations.